**John H. HALSTEAD, d.b.a. Western Manufacturing Co., a partnership, Plaintiff,**

v.

**GLOBE HOIST COMPANY, a corporation, Defendant.**

**Civ. A. No. 40074.**

United States District Court
N. D. California, S. D.

May 4, 1964.

Boyken, Mohler & Foster, San Francisco, Cal., Dirks Foster, Trial Atty., San Francisco, Cal., for plaintiff.

Townsend & Townsend, San Francisco, Cal., Connolly, Bove & Lodge, Athur G. Connolly, Trial Atty., Wilmington, Del., for defendant.

WEIGEL, District Judge.

Plaintiff, John Halstead, doing business as a partnership under the name, Western Manufacturing Company, is the owner of two patents in the vehicle lifting field. Patent 2,949,978 (hereafter referred to as '978) relates to a type of frame contact automobile hoist.[1] Patent 2,956,643 (hereafter referred to as '643) relates to an automatic safety leg used in conjunction with vehicle lifts.[2]

Plaintiff charges defendant, Globe Hoist Company, with manufacturing devices which infringe Claims 3, 4 and 5 of the '978 patent, and Claims 1 and 2 of the '643 patent.

Defendant challenges the validity of both patents. With regard to infringement, defendant admits that if the patents in suit are valid, patent '978 is infringed by its FN–10 vehicle lift and patent '643 by the first of the accused safety legs. However, defendant denies that the '978 patent is infringed by its FS–10 (new) and FS–27 vehicle lifts and also denies that the '643 patent is infringed by the second of its accused safety legs. As a further defense, defendant asserts that it was granted a free license by plaintiff to manufacture safety legs covered by the '643 patent.

## THE HALSTEAD '978 PATENT

The subject matter of this patent is a vehicle hoist or lift used in service stations or garages for raising automobiles and light trucks to an elevated position so that the undersides of such vehicles may be lubricated and repaired. The patent itself relates solely to the superstructure of the lift, that is, to that part of the lift which is normally supported on the upper end of a cylinder raised and lowered by hydraulic or hydraulic-pneumatic means. Both the patented lift and all the other lifts referred to herein are of a type commonly referred to as "frame lifts" because they engage a vehicle by its frame in order to lift it.

Frame lifts first gained acceptance in the early 1950's as a means of lifting a vehicle with a minimum of obstruction of the vehicle underbody by the lift superstructure. In this they were superior to previous "drive on" wheel lifts and axle lifts. Most of the autos and light trucks on the road at that time had frames of substantially standard configuration and, therefore, the first frame lifts were relatively inflexible. These lifts generally employed two parallel rails joined in the manner of an H, which rails were fitted with movable adapting devices to accommodate the minor variances that might be encountered from one vehicle frame to another. Appropriately, this type of lift was called an "H frame" lift.

In the mid 1950's the shapes and dimensions of the frames of automobiles used in the United States began to show more variance from make to make. Therefore, it became necessary for lift manufacturers to devise more flexible frame lifts.

At about this time, plaintiff began producing an H frame lift which employed,

---

1. Applied for December 19, 1958; Issued August 23, 1960.

2. Applied for July 2, 1957; Issued October 18, 1960.

on each of the four rails of the H member, a relatively versatile adapter. (Halstead 2,899,020, not here sued upon, issued August 11, 1959.) This adapter was mounted for both sliding and rotation with respect to the H rail on which it was supported. In addition, the adapter could slide in or out along its rotational axis so that it could serve as an arm for reaching to either side of the rigid rail. Defendant, during this period, also produced an H frame lift employing actual arm-like adapters which were slidable on and pivotable from the H rails. (Wallace 2,958,395, not here accused, issued November 1, 1960.)

Increased reaching flexibility was also achieved in another manner by a type of frame lift commonly called a "swinging arm" lift which employed four swinging arms directly connected to a small central base member. (Cochin 2,878,897, issued March 24, 1959.) The significant difference between the swinging arm lift and the H frame lift is that in the H frame lift, the rails are stationary and the adapter arms pivot in and out from these rails, while in the swinging arm lift, the rails themselves are pivoted from the central base member.

A feature common to lifts introduced in both the early and mid 1950's is the lifting pad. This is a separate metal surface, secured to the lift base member or adapter, which provides the actual contact area between the lift and the vehicle frame. In the early Pelouch patent 2,769,508, issued November 6, 1956, a lifting pad is shown attached to the end of each of the four rails of the H shaped base member. This pad is pivoted for offset rotation with respect to the end of its respective rail. In Cochin 2,777,538, issued January 15, 1957, and Wallace 2,958,395, the lifting pads are secured to the ends of the adapter arms which are slidably and pivotably mounted with respect to the rails of the H shaped base member. In the Cochin patent, each pad is circular in shape and·

rotatably affixed to the adapter arm. while in the Wallace patent, each pad is rectangular and non-rotatable with respect to the arm. In plaintiff's prior art, Halstead 2,899,020, the rectangular lifting pads are co-extensive with the length of the adapter arms and although not rotatable with respect to such arms, are rotatable with respect to the rails of the H shaped base member. In the Cochin 2,878,897 swinging arm patent, non-rotatable rectangular pads are mounted on shoes slidable the length of the swinging arms.

The later of these lift patents show hinged jacks or tip-ups incorporated into the lifting pads. (Cochin 2,878,897; Halstead 2,899,020; Wallace 2,958,395.) Such jacks, when lying in a horizontal position, form a part of the flat lifting pad, but when tilted into an upright position, they serve to contact parts of the vehicle located in a portion of the underbody too high to be reached by the flat lifting pad. In Halstead 2,899,020, the jack is rotatable with respect to the H rail.

In the late 1950's two developments caused lift manufacturers to seek to make their products even more flexible. These were: (1) The large increase in this country in the number of foreign cars with small wheel bases and eccentric lifting points [3] and (2) the development by American manufacturers of new vehicle underbodies such as X frames and unitized body structures. It was during this period that plaintiff designed the lift claimed by the '978 patent in suit in an effort to meet all lifting problems then in existence in a safe and convenient manner. In June, 1958, plaintiff began to market a commercial embodiment of the '978 patent called the "Du-Al". The "Du-Al" is an H frame lift which employs an H shaped base member, more narrow than that of plaintiff's prior lift (Halstead 2,899,020) so that it can be straddled by the small foreign autos. To compensate for the narrower base

---

3. The manufacturers of Volkswagens, for instance, recommend that these cars be lifted in the rear by the tortion bar tube.

member, the adapter arms are made longer than in previous lifts so that American cars and trucks can also be accommodated.

Basically, the patent in suit claims a combination of the following elements.[4]

(1) A horizontally extending base member. (Claim 5 carefully describes an H shaped base member, but Claims 3 and 4 refer only to "a horizontally extending base member.")

(2) Elongated arms, pivoted to the base member for swinging in a horizontal plane so that they describe the arc of a circle overlapping the corresponding circle of an adjacent arm.

(3) A slide mounted for sliding along each arm.

(4) A rectangular rotatable pad having a vehicle frame engaging surface and supported on each slide for rotation with regard to the slide (Claims 3, 4 and 5) and including:

(a) An offset axis of rotation (Claims 3 and 5).

(b) A jack having an end surface which can be pivoted upwards to engage a vehicle frame (Claim 4).

It is the combination of these elements in this manner which the plaintiff claims as his patentable invention. Although plaintiff admits that all of the basic elements of the patented device are shown in the prior art, he contends that he has combined them in a new way to form a lift able to perform lifting functions of which the prior art lifts were incapable. He, therefore, asserts that his claims were rightfully patented. This assertion is dealt with, infra, in the court's opinion relating to the validity of the '978 patent.

Plaintiff further asserts, and defendant denies, that these claims, in addition to covering H shaped frame lifts, are broad enough to cover swinging arm type frame lifts such as plaintiff's "Rota-Swing" and defendant's FS–10 (new)

and FS–27. This is dealt with, infra, in the court's opinion relating to infringement of the '978 patent. However, it is necessary to note at this point that this court there holds that the '978 patent does *not* cover swinging arm lifts. Therefore, the court's remarks with regard to the validity issue proceed on the assumption that the elongated pivoting arms referred to in the patent claims are *adapter* arms slidably and pivotably mounted on the rails of an H shaped base member and not the swinging rails pivotably mounted on a small central base member as shown by Cochin 2,878,897 swinging arm lift.

## VALIDITY

██ In testing the validity of the patent claims here in suit, the court has been mindful that a presumption of validity attaches to a patent granted by the patent office, and that this presumption may only be overcome by clear and convincing proof. Patterson-Ballagh Corp. v. Moss, 201 F.2d 403 (9th Cir., 1953); Moon v. Cabot Shops, 270 F.2d 539 (9th Cir., 1959). Still, the ultimate responsibility in determining whether the combination here claimed is patentable lies solely with the court, and the responsibility for determination of that question cannot be abdicated to another agency. Farr Co., v. American Air Filter Co., 318 F.2d 500 (9th Cir., 1963).

During the course of the trial it was demonstrated that the Halstead '978 device met the necessary requirements of novelty and utility set forth in the patent statute. 35 U.S.C. §§ 101, 102. But from the outset of the trial, the court has been much perplexed as to whether plaintiff's patented device met the equally necessary statutory requirement of non-obviousness. 35 U.S.C. § 103. In deciding this question in the negative, the court has been guided by the principles set forth by the Supreme Court in the landmark case of Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co., 340 U.S. 147, 152, 71 S.Ct. 127,

---

4. Claims 3, 4 and 5 of the '978 patent are set out in the Appendix.

95 L.Ed. 162 (1950). It was there pointed out that the function of a patent is to add to the sum of useful knowledge and that a patent should not be upheld when its effect is to subtract from the resources formerly available to persons skilled in the art. When a device brings only old elements together, it is not patentable unless it can be found that they perform not only an additional or different function in the combination than they do out of it, but that the combination is not "wanting in any unusual or surprising consequences".

Applying these standards to the '978 patent, it seems clear that the mechanical combinations claimed therein produce no unusual or surprising results.

*Claims 3 and 5:* The mounting of a rectangular lifting pad for *offset* rotation with respect to a pivotable adapter arm does, as asserted, minimize obstruction by allowing displacement of the adapter arm to either side of the pad once the pad has been properly located under a lifting point. However, it is clear from the evidence that a person skilled in the art, desirous of achieving such a result, would have had no difficulty in settling upon this particular combination of elements old in the art.[5] As soon as the narrowing of the H shaped base member necessitated the use of adapter arms of a length sufficient to create an obstruction of substantial areas of a vehicle underbody, offset rotation of the lifting pad was employed to reduce such obstruction. It was an obvious thing to do. The problem did not puzzle the industry for any length of time.

*Claim 4:* This claim teaches a rectangular lifting pad containing a jack or tip-up which is rotatable (not specifically about an offset axis) and slidable with respect to a pivotable adapter arm. As such it encompasses the combination of

elements which functions to permit the proper angling of the pad or, when tipped up, the jack under a vehicle lifting point for secure engagement of that point. However, plaintiff's own prior art 2,899,020 patent teaches a relatively similar pad and jack different only in that it is slidable and rotatable with respect to a rigid H rail rather than a pivotable adapter arm.[6] In the '978 patent, plaintiff merely followed the simple expedient of mounting a pad and jack slidably and rotatably with respect to an elongated pivotable adapter arm rather than with respect to a rigid H rail. Such a positional change was essentially dictated by the dimensional relationship between the narrowed base member and lengthened adapter arm contemplated for the '978 device. To anyone who had the 2,899,020 patent and the other pertinent prior art before him, it seems clear on the face of things (and the evidence shows it was to those skilled in the art) that relocation of the pad and jack was an obvious means of accomplishing the objectives of Claim 4. The Court of Appeals for the Ninth Circuit recently included in its opinion in Pierce v. Ben-Ko-Matic, Inc., 310 F.2d 475, 477 (1962), the following apt statement from Perfect Circle Corp. v. Hastings Manufacturing Co., 162 F.Supp. 777, 784 (D.C.W.D.Mich., 1958):

> "The improvement of one element or part in a combination of old elements or parts does not entitle a patentee to a monopoly on the entire combination. * * * A patent should not be granted for the discovery of a result which would flow naturally from the teachings of the prior art. * * * The extended application or the carrying forward of an earlier idea or conception of another involving a change in form,

5. Offset rotation of a lifting pad is found in Pelouch 2,769,508; the rectangular lifting surface of the adapter in Halstead 2,899,020 can be positioned for offset rotation with respect to the rigid H rail; swinging adapter arms are found in Halstead 2,899,020 and Wallace 2,958,395.

6. As pointed out, supra, at page 1014, the lifting surface although actually on the 2,899,020 adapter arm is rotatable only with respect to the H rail.

material, proportion or degree where the same work is performed in substantially the same way by substantially the same means although with better results, does not constitute invention. Mere advance in efficiency and utility is not sufficient to convert a noninventive aggregation of old elements and parts into a patentable combination. * * * Minor differences in design and construction of a patented device over the prior art, involving no new principles and accomplishing nothing more than one skilled in the art could readily discern, do not amount to invention. * * *

"* * * the ingenious application of known principles to a known problem by the use of devices already known and understood to produce a predictable result does not amount to invention. * * *"

■ Although no single lift shows the exact combination of '978, the difference between the total teachings of the prior art and plaintiff's patent is insubstantial and plaintiff's combination must be held to have been obvious to one skilled in the art. Griffith Rubber Mills v. Hoffar, 313 F.2d 1 (9th Cir., 1963).

■ It is true that the embodiment of the '978 patent met with commercial success. Such evidence, however, is but "a weak reed for a patentee to lean upon" and when invention is clearly lacking it will not make for patentability. McCord Corp. v. Beacon Auto Radiator Co., 193 F.2d 985, 989 (1st Cir., 1952); Farr Co. v. American Air Filter Co., 318 F.2d 500 (9th Cir., 1963).

■ Therefore, since there is nothing in Claims 3, 4 and 5 of the '978 patent which produces results which would not have been obvious to one skilled in the art, these claims are declared invalid.

## INFRINGEMENT

■ Since the above claims of the patent are invalid, they cannot be infringed. Dresser Industries v. Smith-Blair, Inc., 322 F.2d 878 (9th Cir., 1963); Bergman v. Aluminum Lock Shingle Corp. of America, 251 F.2d 801 (9th Cir., 1957). But to completely dispose of the case, the court now decides the issue of infringement, assuming for that purpose that the '978 patent is valid.

Since defendant has admitted that its FN–10 device, employing a rigid H shaped base member, infringes Claims 3, 4 and 5 of the patent in suit (assuming validity), the court must resolve only the question of whether its swinging arm lifts, the FS–10 (new) and the FS–27 infringe, as charged, Claims 3 and 4. It is concluded that they do not.

■ Both Claim 3 and Claim 4 of the '978 patent teach a lift containing, among other elements: A horizontally extending base member; and, elongated arms pivotably supported on the base member. When pivoted, these arms describe arcs of circles overlapping the corresponding circles of adjacent arms. It is well established that the claims of a patent are to be understood and interpreted in the light of their specifications. Schriber-Schroth v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940); Oregon Saw Chain v. McCulloch Motors Corp., 323 F.2d 758 (9th Cir., 1963); Kemart Corp. v. Printing Arts Research Labs., Inc., 201 F.2d 624 (9th Cir., 1953). Reading these claims accordingly, the components taught are a base member which is unmistakably H shaped and adapter arms which can rotate through a full 360 degree circle. There is nothing in either the specifications or the drawings of the patent to indicate that the patentee had in mind mechanical components differing in any substantial degree from those he there set forth.[7] The

---

7. The fact that plaintiff, during prosecution of his patent, presented a brochure to the patent office showing an H frame lift with fully rotatable adapter arms which it was claimed would reach "an endless variety of pick-up positions" indicates that the H shaped base member and the complete rotatability were deemed features involved in the claimed invention.

drawings repeatedly show only a rigid H shaped base member. Claim 5 specifically describes such a base. The more vague description of a "horizontally extending base member" in Claims 3 and 4 cannot enlarge the patent to cover a base member so radically different from that taught by the drawings and specifications.

Defendant's FS–10 (new) and FS–27 lifts contain neither a base member nor adapter arms of the type taught by the '978 patent. In the FS–10 (new), the base member from which the swinging arms are pivoted can be analogized to an H shape only by an unwarranted stretch of the imagination. In reality, it is nothing more than a practically rectangular metal plate with a means provided at each of the four corners for pivoting the swinging arms. There is a slight protrusion at each of the corners to accommodate those pivot means, but the base member contains no equivalent to the long H rails which make up the "horizontally extending" element of the H shaped base member taught by the drawings and specifications of the '978 patent. The FS–27 device departs even further from the horizontally extending base member taught by '978. It is a swinging arm lift employing two unjoined base members, supported on separate hydraulic cylinders. As for 360 degree rotation of the pivoted arms, both the FS–10 (new) and the FS–27 show arms which are *limited* in their rotation to an angle of approximately 45 degrees. Thus, the accused devices are more than mere colorable departures from the '978 patent. They embody elements which are substantially different from those taught by the claims, drawings and specifications of that patent.

In Lockwood et al. v. Langendorf United Bakeries, et al., 324 F.2d 82, 88 (1963), the Court of Appeals for the Ninth Circuit recently reiterated the following well settled principles:

"Even if a claim can be read in terms upon an accused article, infringement does not necessarily follow unless it can be found as an ultimate fact that the article uses the inventor's idea as embodied in the inventor's design and drawings and that there is sameness or equivalence of function and means. * * *

"The mere fact that the accused article performs the same function and achieves the same result as the patented article does not necessarily establish infringement unless it can be found that this is accomplished in substantially the same way and where, as in this case, the art is fairly crowded and the main elements of the patent are found or indicated in prior art, this issue should be determined narrowly rather than liberally. If in fact, not merely colorably, the accused article departs from the teaching of the patent in the means by which it achieves the result there is no infringement. * * *

"In a combination patent, such as involved in this case, every element of a particular claim is presumably essential and, therefore, every element of the claim, or its functional equivalent, must ordinarily be found in the accused article. * * * "

Since the court finds that the accused FS–10 (new) and FS–27 devices lack the above two elements or their functional equivalents, it holds that these devices do not infringe the '978 patent.

### THE HALSTEAD '643 PATENT

The subject matter of this patent is an automatic safety leg for use with automobile lifts to prevent the lift from accidentally falling should the hydraulic pressure fail. The type of safety legs involved in this case consist basically of: A hollow tubular casing sunk below the level of the floor and parallel to the hydraulic lift cylinder; a piston fitting telescopically into such casing and connected at its upper end to the lift superstructure; a latch bar pivotably mounted in a diametric slot through the piston. When the lift superstructure is at floor level, the full length of the piston rests inside the casing and the latch bar is

within the piston in a substantially vertical position. As the lift rises, the piston rises, and when the piston reaches a height at which the diametric slot is above the top of the casing, the latch bar rotates by automatic means into a horizontal latched position. In the latching position, the ends of the bar project out of either side of the piston slot and prevent the piston from falling back into the casing. Since the piston is connected to the lift itself, this prevents the lift from falling.[8]

Turning to plaintiff's '643 patent, it teaches a latch bar in which one end is longer and heavier than the other, the heavier end being substantially as wide as the inside of the casing. Viewed from the side, the longer end has a substantially straight lower edge and the shorter end an upwardly curved lower edge. This latch bar is designed to move from its vertical set position to its horizontal latched position solely by the force of gravity. It is mounted on its pivot in such a way that when the bar is fully within the piston in the vertical set position, its center of gravity lies to one side of its pivot pin. It is restrained from falling from this position to the latched position only by the inner wall of the tubular casing. When the piston is raised out of the casing, this restraint is removed and the force of gravity pulls the latch bar into the horizontal latched position. In the latched position, the long end extends out to one side of the piston and the short end to the other. The center of gravity of the bar, although moving downward with the long end of the bar, remains to the same side of the pivot pin as in the vertical set position. To permit the lift to be lowered, the operator of the lift places his hand or foot under the long end of the latch bar and rotates it backwards to an unlatched position at which the long end extends obliquely to the opposite side of the piston (the short end being completely within the piston). As it moves backward to the oblique unlatched position, the long end of the bar describes an obtuse angle and the center of gravity of the bar passes to the opposite side of the pivot pin from that to which it lies in the set and latched positions. As the lift is lowered, the lip of the tubular casing engages the obliquely extending end of the latch bar and cams it back into the vertical set position within the piston. As the bar is so cammed, its center of gravity passes back to the other side of its pivot pin.[9]

### VALIDITY

■ Careful scrutiny of the prior safety leg art, as well as the art of those fields which could be considered even remotely analogous to it, reveals no device that has the design and operational characteristics of the '643 patent. Plaintiff was the first to make a latch mechanism with but a single moving part with these features: (1) Movement by gravity from a position within a piston to a latched position in which the ends extend from either side of said piston and (2) movement to an opposing oblique position to be reset in the manner described above.

The evidence as to this patent, rather than overcoming the presumption of validity, has strengthened that presumption into a certainty on the part of this court that plaintiff's automatic safety leg is a new, useful and non-obvious advance over the prior art. The tests for patentability set forth in 35 U.S.C. §§ 101, 102, 103 are met and the patent is, therefore, valid.

### THE ALLEGED FREE LICENSE

Prefatory to dealing with the issue of infringement, the court disposes of defendant's contention that it was granted

---

8. Safety legs also serve the function of keeping the lift superstructure from rotating around the axis of the lifting cylinder since they secure the lift at a point additional to the top of the lifting cylinder.

9. Claims 1 and 2 of the '643 patent are set out in the Appendix.

a free license by plaintiff to produce and sell safety legs covered by the '643 patent.

 The evidence discloses that plaintiff did offer defendant a license during a discussion at a 1957 Washington, D. C., convention. The license, however, was not to be "free". In return for such a license, plaintiff contemplated that defendant's sales of the patented device would help create commercial acceptance of it. But the court finds that plaintiff's offer was not unlimited as to time, nor, indeed, that it was meant to continue for a substantial time after it was made. Defendant did not then accept the offer. It did not begin producing safety legs which copied the '643 device until the latter part of 1960. Even if it is assumed *arguendo* that the offer was for a unilateral contract and that defendant could accept by the mere doing of the act bargained for, it is basic contract law that an offer not specifically limited as to time will expire within a reasonable lapse of time and cannot, thereafter, be accepted.[10] Certainly under the commercial circumstances, three years was an unreasonable length of time for such an offer to remain open and defendant's manufacture of infringing safety legs, if intended to be an acceptance of plaintiff's offer, was too late.

## INFRINGEMENT

Defendant admits that the first of its accused safety legs was derived from plaintiff's '643 patented device and that if, as is the case, the patent is valid and no free license to copy existed, it has infringed by manufacture of this first device.

The second of defendant's accused safety legs, however, departs in several important respects from the device taught by the claims, drawings and specifications of the '643 patent. The latch bar in the accused device is not of the shape specified in the '643 patent. Its lower edge, when viewed from the side, is substantially straight *at both the long and the short ends*. The bar does not move solely by the force of gravity from the vertical set position to the horizontal latched position, but is assisted at the outset of this downward movement by the thrust of a spring.[11] To unlatch the latch bar in the accused device, it must be pushed horizontally forward on its pivot pin rather than rotated backward through an obtuse angle. In the unlatched position, therefore, the long end of defendant's latch bar extends further to the same side of the piston it occupies in the latched position. It is not, as in the '643 device, moved to an oblique angle on the opposite side of the piston. The center of gravity of the latch bar remains on the same side of the pivot pin in the set, latched and unlatched position. It is not, as in plaintiff's device, rotated to the opposite side of the pivot pin when the bar is moved to its unlatched position.

It is held that plaintiff's '643 patent finds neither literal nor equivalent response in the second of defendant's accused safety legs. Therefore, defendant's second device does not infringe that patent. Lockwood et al. v. Langendorf United Bakeries, et al., supra.

Counsel shall undertake within thirty (30) days to agree upon a judgment carrying out the foregoing which constitute the court's findings and conclusions. If they cannot agree, the court will consider and resolve their differences.

## APPENDIX

*Halstead Patent No. 2,949,978, Claims 3, 4 and 5.*

3. In a vehicle lift including a horizontally extending base member, a

10. Restatement, Contracts, Section 40. (1932).

11. There is evidence that it is not uncommon for the pivot pin in a safety leg's latching mechanism to become clogged with grit and oil. When this happens, gravity alone will not suffice to start the latch bar on its downward rotation into the latched position. Therefore, the use of a spring to give initial impetus to the latch bar is an important feature and is more than a mere colorable departure from plaintiff's device.

plurality of vehicle frame support devices, each comprising: an elongated arm, pivot means connecting one end of said arm to said base member for swinging said arm in a horizontal plane with the other end of said arm extending outwardly away from said base member and describing an arc of a circle overlapping the corresponding circle of an adjacent arm, a slide supported on said arm for sliding from said one end to said other end of said arm, a vehicle frame engaging pad having an upper supporting surface of substantial rectangular area, and means supporting said pad on said slide for rotation of said pad with respect to said arm about a vertical axis extending through said pad for orienting said pad to provide maximum support area to such vehicle frame, said vertical axis being offset from the center of said surface.

4. In a vehicle lift including a horizontally extending base member, a plurality of vehicle frame support devices, each comprising: an elongated arm, pivot means connecting one end of said arm to said base member for swinging said arm in a horizontal plane with the other end of said arm extending outwardly away from said base member and describing an arc of a circle overlapping the corresponding circle of an adjacent arm, a slide supported on said arm for sliding from said one end to said other end of said arm, a vehicle frame engaging pad having an upper supporting surface of substantial rectangular area, and means supporting said pad on said slide for rotation of said pad with respect to said arm about a verticle axis extending through said pad for orienting said pad to provide maximum support area to such vehicle frame, said pad including at least one jack providing said upper surface and having an adjacent end surface extending transversely of said upper surface, horizontal axis pivot means swingably supporting said jack at a point remote from said end surface for swinging said jack from a first position in which said upper surface extends generally horizontally to a second position in which said end surface is directed upwardly for supporting such vehicle frame.

5. In a vehicle lift including a horizontally extending base member, a plurality of vehicle frame support devices, each comprising: an elongated arm, pivot means connecting one end of said arm to said base member for swinging said arm in a horizontal plane with the other end of said arm extending outwardly away from said base member and describing an arc of a circle overlapping the corresponding circle of an adjacent arm, a slide supported on said arm for sliding from said one end to said other end of said arm, a vehicle frame engaging pad having an upper supporting surface of substantial rectangular area, and means supporting said pad on said slide for rotation of said pad with respect to said arm about a vertical axis extending through said pad for orienting said pad to provide maximum support area to such vehicle frame, said vertical axis being offset from the center of said surface, said base member including two opposed pairs of spaced, parallel, horizontally extending rails connected to power lifting means and a shoe slidably mounted on each of said rails for sliding longitudinally thereof, each said arm being connected to one of said shoes.

*Halstead Patent No. 2,956,643, Claims 1 and 2.*

1. An automatic safety leg for vehicle lifts, comprising a vertical, tubular casing having an open top end, an elongated cylindrical piston fitting in vertically sliding, telescopic relation into said casing and extending a slidably adjustable distance upward above said open top end, said piston containing a diametric slot that rises above the top end of said casing as the piston slides upward and moves into the casing as the piston slides

downward, a latching bar means rotatively supporting said bar within said slot for rotation therein about a horizontal axis, and the piston having means limiting such rotation to an obtuse angle between a substantially horizontal position of the latching bar and an oblique position of the latching bar, the bar in rotation passing through a substantially vertical position between said horizontal position and said oblique position, the center of gravity of said bar being both above and to one side of the axis of rotation when the bar is vertical, and to the same side when the bar is horizontal, so that the latching bar rotates automatically from said vertical position to said horizontal position under the influence of gravity whenever said slot rises above the top end of said casing, the center of gravity of said bar passing over to the other side of the axis of rotation when said bar is rotated from said vertical position to said oblique position, the heavier end of said bar being sufficiently long and wide to project outward from said slot in one direction when the latching bar is in said horizontal position and to project outward from said slot in the opposite direction when the latching bar is in said oblique position, the width of said heavier end being approximately equal to the inside diameter of said casing, whereby said bar is automatically rotated to said vertical position whenever said slot moves into said casing, the lighter end of said bar being of such length and width that it projects outward from said slot opposite said heavier end only when the latching bar is in said horizontal position, the two projecting ends of said bar in the horizontal position extending over diametrically opposite portions of the upper end of said casing and thus restricting downward movement of the piston, whereby the piston is automatically latched in a raised position whenever said slot is raised above the top end of said casing, and may there-

after be released for lowering by rotating said bar to said oblique position.

2. An automatic safety leg for vehicle lifts, comprising a vertical, tubular casing having an open top end, an elongated, cylindrical piston fitting in vertically sliding, telescopic relation into said casing and extending a slidably adjustable distance upward above said open top end, said piston containing a diametric slot that rises above the top end of said casing as the piston slides upward and moves into the casing as the piston slides downward, a horizontal pin attached to said piston and extending across said slot, and a latching bar disposed in said slot and rotatively mounted upon said pin, said bar being sufficiently long that its two ends project outward from opposite sides of said slot when the bar is horizontal, extending over diametrically opposite portions of the upper end of said casing and thereby limiting downward motion of said piston, one end of said bar being longer and heavier than the other, said longer end having a substantially straight lower edge and the shorter end having an upwardly curved lower edge as viewed with the bar horizontal, a part of said piston at the bottom of said slot being in contact with the lower edge of the longer end of said latching bar when said bar is substantially horizontal, thereby limiting rotation of said bar in one direction, said slot having sufficient vertical length that both ends of said bar can enter the slot when the bar is turned to a vertical position by raising its longer end, a part of the piston at the lower end of said slot contacting the curved edge of the shorter end of said bar as the bar is turned past the vertical to an oblique position, whereby rotation of said bar about said pin is limited to an obtuse angle between said horizontal and oblique positions, the longer end of said bar having an outer portion that is substantially as

wide as the inside diameter of said casing, whereby the latching bar is automatically rotated from its oblique position to its vertical position whenever said slot moves into said casing, the upper edge of the latching bar, as viewed in the horizontal position of the bar, being partially cut away sufficiently that the center of gravity of the latching bar lies to the same side of said pin when the bar is vertical as when the bar is horizontal, whereby the bar falls automatically, under the influence of gravity, from its vertical to its horizontal position whenever said slot is raised above the top of said casing, said center of gravity passing over to the other side of said pin when the latching bar is rotated to its oblique position.