**MOBIL OIL CORPORATION,**
**Plaintiff-Appellant,**

v.

**FILTROL CORPORATION and Texaco Inc., Defendants-Appellees.**

**MOBIL OIL CORPORATION,**
**Plaintiff-Appellee,**

v.

**FILTROL CORPORATION and Texaco Inc., Defendants-Appellants.**

Nos. 71–2512, 71–2559, 71–2534 and 71–2560.

United States Court of Appeals, Ninth Circuit.

July 22, 1974.

George B. Finnegan, Jr. (argued), of Morgan, Finnegan, Durham & Pine, Sanford M. Litvack (argued), of Donovan, Leisure, Newton & Irvine, New York City, for appellant.

William K. Kerr, Herbert F. Schwartz, Eric C. Woglom, William J. Hone, Fish & Neave, Hulit L. Madinger, New York City, John G. Flett, Thelen, Marrin, Johnson & Bridges, Los Angeles, Cal., for appellees.

## OPINION

Before CHAMBERS, CARTER and GOODWIN, Circuit Judges.

JAMES M. CARTER. Circuit Judge:

In this patent case the district court held that certain claims of Mobil's U.S. Patents 3,210,267, 3,436,357 and 3,459,680 were valid and not infringed by either Filtrol or Texaco, and dismissed Filtrol's counterclaim for misuse of patents and damages.

Mobil has abandoned its appeal from the judgment of non-infringement as to Patent 3,210,267 (hereafter # '267) and as to claim 1 of Patent 3,436,357 (hereafter # '357). There remains Mobil's appeal from the judgment of non-infringement as to claims 17 and 24 of # '357 and claims 10, 11 and 12 of Patent 3,459,680 (hereafter # '680).

In Appeal No. 71–2559, Mobil appeals from the amended judgment of August

17, 1971, holding Patents # '357 and # '680 not infringed.

In Appeal No. 71–2560, Filtrol and Texaco cross-appeal from the amended judgment of August 17, 1971, holding # '267, # '357 and # '680 valid; and Filtrol cross-appeals from the amended judgment of August 17, 1971, dismissing with prejudice its counterclaim for patent misuse and damages.[1]

The questions presented are:

1. *Appeal No. 71–2559*: Did the district court err in holding the patents not infringed?

2. *Appeal No. 71–2560*: Did the district court err in finding the patents valid, since it held them not infringed?

3. *Appeal No. 71–2560*: Did the district court err in dismissing Filtrol's counterclaim for misuse of patents and damages?

Three sets of findings of fact and conclusions of law were filed covering (1) non-infringement, (2) validity, and (3) misuse of patents. At argument here, the question was raised of possible conflicts in the findings on validity in sets (1) and (2) of the findings.

We are informed that the district court directed the prevailing party to prepare the findings on each of the three questions, which explains the conflict. The findings prepared by Mobil on validity broadly construed the patents. The findings prepared by Filtrol and Texaco on infringement narrowly construed the patents and then held them non-infringed.

 It is better practice not to permit a prevailing party substantially to control the findings. Here, however, we believe that the immensity of the task of preparing findings, owing to the size of the record and the complicated problems involved, dictated the course adopted by the district court.

The question whether the district court erred in holding the patents both

1. Appeals No. 71–2512 and No. 71–2534 were from the judgment of June 24, 1971, which was superseded by the amended judgment of August 17, 1971. These two appeals are dismissed.

valid and non-infringed is one of law. The *non-infringement* question is largely one of fact. We find no insurmountable problem regarding the conflicts.

We affirm the district court on the holding of non-infringement and reverse the district court on its *holding of validity*. We affirm the district court on its dismissal of the counterclaim for patent misuse and damages.

## I.

### *Mobil's patents were not infringed*

We noted above the possible conflict between the findings on validity (prepared by Mobil), construing the patents broadly, and the findings on infringement (prepared by Filtrol and Texaco), construing the patents narrowly.

In the findings on infringement the trial court was following the well-known principle of patent law that where claims are close to the prior art, often they cannot be construed broadly enough to be infringed without also being so broad as to be invalid. See *National Screw & Mfg. Co. v. Voi-Shan Industries, Inc.* (9 Cir. 1965) 347 F.2d 1, 3; *Air Devices, Inc. v. Air Factors, Inc.* (9th Cir. 1954) 210 F.2d 481, 482, cert. denied, 348 U.S. 825, 75 S.Ct. 41, 99 L. Ed. 651; *Nye & Nissen v. Kasser Egg Process Co.* (9 Cir. 1938) 96 F.2d 420, 424–425.

The trial court concluded:

"15. If, in order to avoid prior art and sustain the validity of a patent, a claim is construed as narrow in scope, this scope cannot be discarded to establish infringement. *Mackay Co. v. Radio Corp.*, 306 U.S. 86, 102 [59 S. Ct. 427, 83 L.Ed. 506] (1939); *Crown Machine & Tool Co. v. D. & S. Industries, Inc.*, 409 F.2d 1307, 1309 (9 Cir. 1969) [cert. denied, 396 U.S. 824, 90 S.Ct. 66, 24 L.Ed.2d 75]. Claims 10–12 of patent 3,459,680, claim 20 of patent 3,210,267 and claims 1, 17 and 24 of patent 3,436,357 cannot be construed broadly enough to be infringed by Filtrol 700, 800, 900 and 810 as made, offered for sale and sold by Fil-

trol and used by its customers, including Texaco, and still be valid over the prior art."

Mobil attempts to rely on the findings on validity (prepared by Mobil) to attack the findings on non-infringement (prepared by Filtrol and Texaco) which were adverse to Mobil. Mobil states in its opening brief:

"In attempting to resolve the issue of infringement, however, Judge Ferguson failed to give effect to his findings (on validity) that the inventions of the claims on appeal constitute a breakthrough in the art. Instead he imposed limitations on the claims. . . .

"But for the restriction erroneously imposed on those claims . . . they . . . have been infringed."

But since we decide in Part II that the part of the judgment holding the claims valid and enforceable was erroneous and reverse that portion of the judgment, we need not consider the findings underlying that portion of the judgment.

Therefore, Mobil, to prevail, must demonstrate that the trial court committed reversible error on the issue of non-infringement.

Mobil's patents in suit are in a very crowded field. The specifications and claims are highly technical. We hold that the findings of fact on infringement made below were not clearly wrong. Accordingly, we refer only in summary form to some of the scientific terminology and the claims of the patent.

### 1. *In general*

The hydrocarbon conversion catalysts of Mobil's patents have two principal components: a crystalline zeolite component is distributed or placed in a second component, a matrix.

The crystalline zeolites, also called crystalline aluminosilicates, are synthetic. Zeolite X is described in Union Carbide's Patent No. 2,882,244 and zeolite Y in Union Carbide's Patent No. 3,130,007.

They were first synthesized by Union Carbide Corp.

The matrix component can be inorganic oxide gels (e. g., silica alumina) or specially treated clay. Both of these, alone or with components, have been widely used as "cracking" catalysts since the 1940s.

"Cracking" with catalysts is an oil refining process by which most gasoline, for commercial purposes, is made. In the process the gas oil, out of crude petroleum, is heated to form a vapor. The hot vapor is brought into contact with finely divided particles of the material known as a catalyst which has been dispersed in the matrix. For reasons still unknown this contract results in "cracking" or the breaking up of large molecules to produce gasoline sized molecules.

The crystalline zeolites have three primary chemical elements: aluminum, silicon and oxygen. In addition, they usually have associated with them some metal, such as sodium, magnesium or a rare earth metal in the form of electrically-charged ions. Such ions, when positively charged, are also called "cations."

By an old and conventional technique called "Base Exchange" the ions of a particular metal associated with the zeolites may be replaced or exchanged with ions of another metal or non-metal (such as ammonium). By use of the "Base Exchange" technique, sodium ions organically associated with a crystalline zeolite may be replaced in whole or in part by magnesium ions, ammonium ions or rare earth ions, or by a combination of such ions.

### 2. The Disclosure and Claims of Patent # '680, Generally

Patent # '680 relates to a two-component composite catalyst made up of a low sodium, rare earth-exchanged synthetic crystalline zeolite (either zeolite X or zeolite Y) component, distributed in and diluted by an inorganic oxide matrix.

The zeolite component is a crystalline aluminosilicate, characterized as a "high activity component having an ordered structure of rigid three-dimensional networks characterized by pores and having openings of nearly uniform diameter in the range of greater than 4 and less than 15 angstrom units." The particularly preferred zeolites are the faujasites, including the synthetic materials such as zeolite X (Union Carbide's U.S. Patent '244) and zeolite Y (Union Carbide's U.S. Patent '007) as well as other crystalline aluminosilicate zeolites having pore openings of between 6 and 15 angstroms.

With respect to the zeolite component, the #'680 specification points out that zeolites X and Y, as synthesized, contain alkali metal (e. g., sodium) cations, and that the presence of such cations make these zeolites unstable and unselective catalysts. To alleviate these shortcomings, the zeolites are base-exchanged to replace the sodium cations with non-alkali metal cations. A substantial portion of the replacement cations must be rare earth cations.

Put in numerical terms, the residual sodium content of the zeolite component of the #'680 catalyst after base exchange is "preferably less than 1%." Because zeolites X and Y contain approximately 12–14% sodium in the as-synthesized form, a reduction in the sodium content to less than 1% means removal of approximately 95% of the sodium cations.

The matrix component's role is to provide attrition resistance and also to dilute the high activity of the zeolite component. The #'680 specification states that useful catalysts must possess physical characteristics [e. g., attrition resistance] required for successful commercial operation. (col. 2, lines 46–48 of the patent). The ability of a particle to hold its shape is a primary requirement for a successful catalyst. (col. 2, lines 50–53 of the patent). To meet this and other requirements, the highly active base-exchanged zeolite (col. 9, lines 10–11 of the patent) is intermixed with a material which will dilute and temper the activity thereof so that currently

available cracking equipment and methods may be employed. (col. 5, lines 32–35 of the patent). This material, called a "matrix," possesses a substantial catalytic activity, but of a lower order than that of the crystalline aluminosilicate. (col. 5, lines 5–8 of the patent). The preferred matrix is the old commercial silica-alumina cracking catalyst because it is known to have high octane number producing properties. (col. 9, line 63, col. 10, line 15 of the patent).

### 3. The Disclosure and Claims 10, 11 and 12 of #'680

"65. Claim 10 of the #'680 patent teaches:

A composite catalyst having a sodium content of less than 1 weight percent, and having two components:

(a) 75% or more of a silica-alumina matrix, and

(b) 25% or less of a crystalline zeolite with specified structural characteristics, catalytically more active than the matrix, the zeolite having associated with it metal cations (excluding sodium) only, a substantial portion of which are rare earth metal cations.

Claim 11 of #'680 adds to claim 10 the requirement that the zeolite be prepared from clay. Claim 12 of the #'680 adds to claim 10 the requirement that the matrix be prepared from clay." [#65, Findings of Fact on Infringement]

### 4. The Disclosure and Claims of #'357 Generally

The #'357 patent relates to two-and-three-component composite catalysts made up of a low sodium, base-exchanged zeolite Y component, a matrix component, and sometimes a diffusivity component, referred to as a "secondary solid additive." It relates also to a method for preparing such catalysts.

The zeolite component of the #'357 composite catalyst is a "crystalline aluminosilicate having a silica to alumina mole ratio in excess of 3." (col. 2,

lines 7–8 of the patent). Zeolite Y, whose preparation is described in Union Carbide's "Belgium Patents Nos. 577,642 and 598,582" (col. 1, lines 62–63 of patent #'357) is the preferred zeolite. In its base-exchanged form, it has a "structure of rigid three-dimensional networks characterized by uniform pores between 6 and 15 Angstroms in diameter and in which substantially all of the original alkali metal has been replaced. . . ." (col. 2, lines 33–40 of the patent). The #'357 specification identifies as "particularly preferred replacing ions" "those of the alkaline earth metals [e. g., calcium], rare earth metals, manganese, ammonium and combinations of such ions with one another." (col. 2, lines 13–16 of the patent).

Mobil's expert testified that the sodium content of the zeolite component of the #'357 patent is also "preferably less than 1%." Stated differently by the trial court, approximately 95% of the sodium cations are replaced by base exchange.

The zeolite component is distributed in a matrix (col. 3, lines 17–19 of the patent), the preferred matrix material being a "cogel of silica" (col. 5, lines 54–58 of the patent), such as silica-alumina, silica-magnesia and the like, although "inorganic oxide gels generally may be utilized as a suitable matrix." (col. 5, lines 52–53 of the patent). The specification refers also to clay as an alternative to the inorganic oxide gel matrix. (col. 4, lines 18 and 39; col. 5, lines 41–51; col. 6, lines 52–58 of the patent).

In addition to the zeolite and matrix components, the #'357 specification (col. 5, lines 7–30 of the patent) mentions a third component, namely, "a secondary solid additive . . . capable of imparting increased diffusivity" to the catalyst.

Only claims 17 and 24 of the #'357 patent are contested by Mobil on the issue of infringement.

(a) Claim 17 of #'357

"43. Claim 1 of the '357 patent teaches a composite catalyst made up of two components:

1. a base-exchanged zeolite, having a silica alumina ratio in excess of 3, in which sodium is removed to the extent that 'the negative electrovalence of the silica and alumina of said aluminosilicate is balanced by ions of at least one member selected from the group consisting of metals below sodium in the electromotive series, calcium, ammonium, hydrogen and combinations of such ions with one another'; and

2. a matrix.

"Claim 17 of the '357 patent adds to claim 1 of the further detailed requirments (a) that the matrix component be an inorganic oxide gel, and (b) that the zeolite component be a Y zeolite, and constitute between 1% and 50% of the composite catalyst. Claim 17 requires that the sodium ions be 'substantially completely replaced by ions of at least one member selected from the group consisting of rare earth metals, calcium, magnesium, manganese, ammonium, hydrogen and combinations of said ions with one another.'"

"44. In product claim 1 of the '357 patent, 'balancing' of the negative electrovalence of the zeolite means 'using other cations to replace that [the original] sodium' . . . . This claim, when read in light of the specification, requires removal of substantially all, i. e., at least approximately 95% of the sodium. Product claim 17 of the '357 patent requires that the sodium cations be 'substantially completely replaced.' This claim when read in light of the specification also requires removal of substantially all, i. e., at least approximately 95% of the sodium." [#43 and #44, Findings of Fact on Infringement]

Although we have set the finding of fact out in full, claim 17 of #'357, in summary form, describes a composite catalyst made up of two components:

1. a Y zeolite component, constituting between 1% and 50% of the composite, in which the sodium ions are "substantially completely replaced by ions of at least one member selected from the group consisting of rare earth metals, calcium, magnesium, manganese, ammonium, hydrogen and combinations of said ions with one another"; and

2. a matrix which is an inorganic oxide gel. [Summary of # 43–44, Findings of Fact on Infringement]

(b) *Claim 24 of # '357*

"55. Claim 24 of the #'357 patent teaches a method for preparing a three-component composite catalyst, the three components being zeolite Y, a matrix, and a secondary solid additive. The four steps of the claimed method are:

(1) Dispersing in a matrix (a) a finely-divided Y zeolite in which at least 70% of the original alkali metal content has been replaced by base-exchange, and (b) a finely-divided secondary solid additive capable of imparting increased diffusivity to the composite;

(2) washing the composite free of soluble matter;

(3) drying it; and

(4) calcining it."

[#55, Findings of Fact on Infringement]

5. *The Findings of Fact on Factual Differences.*

The trial court, after comparing the Filtrol zeolite-containing catalysts with the Mobil patent claims in suit, found that the Filtrol catalysts were "fundamentally different" from the Mobil patents. One such difference was the high sodium content of Filtrol's zeolites. The court found:

"41. In contrast to the emphasis on low sodium in the three patents in suit, Filtrol did not concern itself with attempting to produce a zeolite

component which was low in sodium. Instead, the zeolites prepared by Filtrol from clay had a high sodium content from the inception of Filtrol's work in preparing them and, as time went on, their sodium content became even higher. *This contrast in sodium content is a fundamental difference between the Filtrol catalysts and the Mobil patents.*" [#41, Findings of Fact on Infringement]

By other uncontested findings (12, 13, 16, 17, 18, 21, 22, 24, 25 and 26 of the Findings of Fact on Infringement) the trial court detailed the independent development of Filtrol's high sodium zeolite-containing fluid cracking catalysts, and described how the Filtrol catalysts (in both the successful fluid versions and unsuccessful moving-bed versions) come into existence. These findings are summarized as follows:

(a) Filtrol's development in the Spring of 1963 of an experimental catalyst which improved, rather than deteriorated, when its sodium content was increased. (Finding 12)

(b) Filtrol's introduction to the market in January 1964 of Filtrol Grade 800, the first commercial zeolite-containing fluid cracking catalyst marketed by any company. (Finding 13)

(c) Filtrol's continuing program to improve its catalysts, including an increase in the sodium content of their zeolite component from 1.9% to 3.3%. (Findings 17, 18)

(d) Filtrol's unsuccessful attempt to enter the moving-bed catalyst field with Filtrol Grade 810, a zeolite-containing catalyst. (Findings 21, 22)

(e) Filtrol's manufacture and sale of the challenged catalysts years before the issuance of Mobil's patents here on appeal. (Findings 24, 25)

·(f) Filtrol's ownership of a patent relating to its challenged catalysts in which the zeolite component, unlike the zeolite components of Mobil's patented catalysts, has low stability to steam. (Finding 26)

Generally, the trial court arrived at its findings and conclusions as to non-infringement on two principal grounds: (1) the factual differences between the patent claim asserted by Mobil and the Filtrol catalysts, and their respective methods of preparation; and (2) Mobil's failure to prove that Filtrol's catalysts had some of the characteristics recited in the Mobil patent claims.

(a) *Factual difference between claims 10–12 of the ('680 patent and the Filtrol catalysts.*

The trial court found as to claims 10, 11 and 12 of #'680 a difference between sodium content in the claims and in the Filtrol catalysts.

"68. The specification . . . of the . . . '680 [patent] teach[es] that the 'original alkali metal ions' (e. g., sodium) (P–2, col. 6, lines 21–22 [of the patent]) are to be replaced by 'other metal cations' 'in conjunction with rare earth' (P–2, col. 6, lines 24–25 [of the patent]). . . . These other metal cations do not include sodium (P–2, col. 6, lines 26–28 [of the patent])."
[#68, Findings of Fact on Infringement]

"69. Claims 10–12 of the '680 patent . . . which recite that the cations of the zeolite component 'consist essentially of metal characterized by a substantial portion or rare earth metal', when read in light of the specifications, require removal of substantially all, i. e., at least approximately 95%, of the sodium."
[#69, Findings of Fact on Infringement]

With respect to the Filtrol catalysts, the court found:

"67. The sodium cations of the Filtrol zeolite ingredient added to Filtrol's accused catalysts are on the order of 25% of the total cations associated with the zeolite component. For this reason alone, these Filtrol zeolite-containing catalysts as made, sold and introduced into a catalytic cracking unit (including Texaco's) are

not described by, and do not fall within, product claims 10–12 of the '680 patent. . . ."

[#67, Findings of Fact on Infringement]

Mobil claims that there is no limitation with respect to the sodium content of the zeolite component of the catalysts described in claims 10, 11 and 12 of #'680. In Finding #69 the trial court found that there was. The trial court also found the corollary in Finding #68, that the term "metal cations" *excludes* alkali metal cations, e. g., sodium. Neither finding was clearly erroneous. If these claims were not so read, they would be teaching the absurd proposition that the original alkali (e. g., sodium) cations of the zeolite would be replaced by other alkali (e. g., sodium) cations.

Further, if claims 10, 11 and 12 were not limited as found by the trial court, "the prior art [of] Fleck patent 2,962,435 . . . alone or together with the prior art [of] Kemberlin patent 2,971,903 . . . would invalidate these claims. . . ." [#75, Findings of Fact on Infringement]

Moreover, Mobil's #'680 alleged invention as found by the trial court is, at most, a composite catalyst having a low sodium zeolite as a matrix. Such a low sodium limitation in the zeolite must be read into the #'680 claim to prevent these from being broader than the actual invention. Del Francia v. Stanthony Corporation (9 Cir. 1960) 278 F.2d 745, 747.

Mobil contended below that the zeolite of #'680 claims 10, 11 and 12 had to have "the sodium removed from it and replaced by metals, primarily the rare earth metals," and that this removal and replacement drove the sodium content of the zeolite "down to a level of less than 1 per cent." Mobil's expert testified that the sodium requirement for the zeolite component in all their patents in suit was "preferably less than 1%." [#34, Findings of Fact on Infringement] The trial court found that a level of less than 1% meant that "substantially all, i. e.,

at least 95% [of the sodium] had to be removed." [#69, Findings of Fact on Infringement]

Mobil urges in this court that there is no limitation whatsoever on the sodium content of the zeolite in claims 10, 11 and 12 of #'680. Mobil relies on low sodium content to avoid the prior art, but urges, in order to defeat Filtrol, that Mobil's claims cover composite catalysts containing zeolites with a sodium content as high as the sodium content of the zeolite components of prior art composite catalysts.

The trial court held Mobil could not have it both ways. It concluded:

"15. . . . Claims 10–12 of patent 3,459,680 . . . and claims 1, 17 and 24 of patent 3,436,357 cannot be construed broadly enough to be infringed by Filtrol 700, 800, 900, and 810, as made, offered for sale and sold by Filtrol and used by its customers, including Texaco, and still be valid over the prior art."

[#15, Conclusions of Law on Infringement]

Mobil contends that claims 10, 11 and 12 of #'680 are broad enough to cover catalysts containing a zeolite component having rare earth cations and either hydrogen or ammonium cations or both. The trial court properly disposed of this contention.

"70. Mobil was forced, during prosecution in the Patent Office of the application for the '267 patent, to distinguish claims 10–12 from the claims of Mobil patent 3,140,253, not asserted in this suit, which call for a zeolite component containing both metal cations and hydrogen cations or precursors thereof (ammonium cations). . . . Mobil then incorporated the language of the '267 patent claims into the '680 patent claims. On this set of facts, claims 10–12 of the '680 patent and claim 20 of the '267 patent cannot be read to cover a zeolite component which contains both metal (other than sodium) cations and

hydrogen cations or precursors of hydrogen cations."

(b) *The Factual Differences between claim 17 of #'357 and the Filtrol catalysts.*

The trial court found that Filtrol's zeolite cracking catalyst did not infringe claim 17 of #'357 because of differences in (1) sodium content and (2) the matrix.

As to sodium, the trial court found:

"44. Product claim 17 of the '357 patent requires that the sodium cations be 'substantially completely replaced.' This claim when read in light of the specification also requires removal of substantially all, i. e., at least approximately 95% of the sodium."

With respect to the Filtrol catalysts, the trial court found:

"45. The sodium cations of the zeolite component of Filtrol's accused catalysts constitute on the order of 25% of the cations associated with the zeolite component. . . . On this basis alone, Filtrol's zeolite-containing catalysts as made and sold by Filtrol do not fall within the sodium ion removal or replacement limitation of claim 17 of the '357 patent."

[#44 and #45, Findings of Fact on Infringement]

As to the matrix, the trial court found:

"46. A further limitation of claim 17 of the '357 patent is its requirement that the matrix be an 'inorganic oxide gel.' The '357 patent specification refers repeatedly to 'clay' and 'inorganic oxide gels' as different materials (e. g., col. 4, lines 17–18; col. 4, lines 38–39; col. 5, lines 50–51; col. 6, lines 52–57 [of the patent]). The clay used in Filtrol's zeolite-containing catalysts is not an 'inorganic oxide gel.' For this second and separate reason, the Filtrol catalysts do not fall within claim 17 of the '357 patent. . . ."

[#46, Findings of Fact on Infringement]

Again Mobil has taken inconsistent positions in the trial court and on this appeal. The findings are not clearly wrong.

(c) *The factual differences between claim 24 of #'365 and the challenged manufacturing process.*

Here the trial court found three separate differences. With reference to the identity of the secondary solid additive, the trial court found:

"56. This claim, when read in the light of the specification of the '357 patent restricts the amount of the 'secondary solid additive' to a maximum of approximately 40% by weight of the composition. (col. 5, lines 8–18 [of the patent])."

[#56, Findings of Fact on Infringement]

With respect to defendants' catalysts, the trial court found:

"57. In attempting to establish infringment of claim 24 Mobil asserted that Filtrol's alumina component was the matrix, and its SR clay component was the 'secondary solid additive' called foi by this claim. . . . Filtrol's clay component (SR fines) is by far the largest component of its catalysts, amounting to between 68 and 78% of the composite catalyst by weight.· . . . Filtrol's clay component cannot be construed to be a 'secondary solid additive' within the meaning of claim 24 of the '357 patent."

[#57, Findings of Fact on Infringement]

Again Mobil's positions were inconsistent and the trial court made note thereof:

"58. Mobil's position with respect to the identity of the matrix in Filtrol's composite catalysts was inconsistent. With Mobil's charge of infringement of claim 24 of the '357 patent, Mobil contended that the alumina component was the matrix. . . . On other issues Mobil asserted that the matrix was something

other than the alumina component (presumably the clay) . . . that 'the matrix was an acid chemically treated silica-alumina clay' . . . or that the matrix was a combination of the clay and the alumina gel. . . . When called on to explain these discrepancies Mobil's expert, Dr. Hawthorne, could only state that these three different definitions of the matrix were 'mistakes' . . . that, in any event, this was 'all semantics' and 'a matter of what we define' the matrix to be. . . . Such vacillation confirms the lack of merit of Mobil's position with respect to infringement of claim 24 of the '357 patent."

[#58, Findings of Fact on Infringement]

The trial court found other differences between claim 24 and the method of making the challenged zeolite-containing catalysts.

"59. Mobil's own descriptions of the Filtrol process of making its zeolite-containing catalysts . . . demonstrate that Filtrol does not perform the step of washing its composite catalyst after the clay, alumina and zeolite components are combined, a step required by claim 24. This is a second and separate reason why the method of preparing the Filtrol catalyst does not fall within claim 24 of the '357 patent."

"62. Filtrol does not perform any heating step which is even contended by Mobil to be 'calcination'. . . . There is no evidence that Filtrol instructed Texaco to perform any particular heating operating on Filtrol catalysts when received, or that Texaco informed Filtrol that it performed any particular operation on the catalysts when received. Nor is there any evidence that Texaco knew the details of Filtrol's manufacturing process."

"63. Texaco uses the Filtrol catalyst by placing it into 'the regenerator' section of its cracking unit. The Texaco regenerator temperature is 1100° to 1200° F. . . . and the new catalyst stays in the regenerator approximately 15 to 18 minutes (substantially less than the time period set in the '357 specification) before it goes into the cracking reactor."

"64. The established differences between the lengthy and specific calcination procedure described and claimed in the '357 patent and the introduction of the catalyst into the regenerator by Texaco make clear that Texaco's use of Filtrol's catalyst does not include 'calcination' within the meaning of claim 24 of the '357 patent. This is a third and separate reason why the method of preparing the Filtrol catalyst does not fall within claim 24 of the '357 patent."

[#59, 62, 63, 64, Findings of Fact on Infringement]

Finding #55 states that the method of patent #'357 includes the step of washing and the step of calcinating the composite catalyst. Finding #42 states that defendants do not perform these steps. Thus two of the four steps of claim 24 of #'357 are omitted by defendants.

The trial court correctly concluded:

"2. Each and every element of a claim asserted to be infringed must be found in the accused product or process. Englehard Industries, Inc. v. Research Instrumental Corp., 324 F.2d 347, 351 (9 Cir. 1963) [cert. denied, 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed. 2d 215]; Haynes Stellite Co. v. Osage Metal Co., 110 F.2d 11, 14, 10 Cir. 1939."

Mobil contends that Filtrol and Texaco split between them the performance of the four steps of the claim. The short answer is that neither defendant ever performed the step of *washing* the composite; second, the calcination step was not performed by Filtrol but by Texaco in its commercial use of catalysts that Texaco purchased from Filtrol. We question whether a method claim can be infringed when two separate entities perform different operations and neither

has control of the other's activities. No case in point has been cited.

Finally, the trial court's findings of the difference between the length and specific calcinations procedure in #'357 patent and Texaco's conventional commercial use compel the conclusions that Texaco's use is not "calcination" within the terms of the claims of the patent.

### 6. *Mobil's Burden of Proof.*

Finally, the trial court found, in substance, that Mobil had not carried the burden of proving infringement by failing to determine and offer proof whether or not the zeolite component of Filtrol's catalysts had the *characteristics* required by claims 10, 11 and 12 of #'680 and claims 17 and 24 of #'357.

"73. Claims 10–12 of the '680 patent . . . require that the zeolite component of the claimed catalysts have a 'structure of rigid three-dimensional networks and uniform pore openings of a size greater than 6 angstroms and less than 15 angstroms.' Claim 24 of the '357 patent requires that the zeolite have 'uniform pore openings between about 6 and 15 angstrom units.' The requirement of rigid three-dimensional networks', although not present in the terms of claim 24 must be read into it in order properly to construe it in light of the prior art and in light of the specification of the '357 patent itself (P–3, col. 2, lines 34–35). Similarly, claim . . . 17 of the '357 patent, when properly construed in light of the prior art and the '357 patent specification (P–3, col. 2, lines 33–35), require[s] also 'a structure of rigid three-dimensional networks characterized by uniform pores between 6 and 15 angstroms.' "

"74. Mobil has never made any tests on the zeolite components of the Filtrol catalysts (MR or MRK) to determine whether or not these components have rigid three-dimensional networks . . . and 'uniform pore openings'. . . . This is a separate

reason why none of these claims is infringed."

[#73 and #74, Findings of Fact on Infringement]

### 7. *Mobil Cannot Rely on the Doctrine of Equivalents.*

Mobil contends that the defendants' catalysts "function in the same way to produce the same extraordinary results" as the patented catalysts and that therefore they must be the same.

Mobil ignores the detailed findings of fact set forth above detailing the differences between the Filtrol catalyst and the claims of the patents in suit.

"The fact that the two devices accomplish the same result, or perform the same function, settles nothing about infringement. . . . Identity of result is no test." Air Devices v. Air Factors (9 Cir. 1954) 210 F.2d 481, 483, cert. denied, 348 U.S. 825, 75 S.Ct. 41, 99 L.Ed. 651 (1954). *Accord: e. g.,* Nelson v. Batson (9 Cir. 1963) 322 F.2d 132, 137; Kemart Corp. v. Printing Arts Research Laboratories (9 Cir. 1953) 201 F.2d 624, 632.

"A finding of equivalence is a determination of fact." Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed. 1097 (1950); Bowser, Inc. v. Filters, Inc. (9 Cir. 1968) 396 F.2d 296, 298–299; Nelson v. Batson, *supra;* Moon v. Cabot Shops, Inc. (9 Cir. 1959) 270 F.2d 539, 545, cert. denied, 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960).

After detailing the numerous differences between the Filtrol products and processes and the patented products and processes, the trial court made the following findings:

"76. Filtrol 800, Filtrol 900 and Filtrol 700, as made, offered for sale and sold by Filtrol and Filtrol 900 as used by Texaco, are fundamentally different from and not equivalent to or the same as the compositions called for by claims 10, 11 and 12 of the '680 patent."

\* \* \* \* \* \*

"78. Filtrol 800, Filtrol 900 and Filtrol 700, as made, offered for sale and sold by Filtrol and Filtrol 900 as used by Texaco, are fundamentally different from and not the equivalent to or the same as the compositions taught by claim 17 . . . of the '357 patent."

"79. Filtrol, together with its customers including Texaco, has made Filtrol 800, Filtrol 900 and Filtrol 700 by processes which are not the same as or equivalent to, but instead are fundamentally different from, that taught by claim 24 of the '357 patent."

[#76, #78 and #79, Findings of Fact on Infringement]

The trial court then concluded as follows:

"12. Even if a claim cannot be literally read on a device or process there can be infringement if the accused device or process is equivalent to what is taught by the claim. Graver Mfg. Co. v. Linde Co., 339 U.S. 605, 608–609 [70 S.Ct. 854, 94 L.Ed. 1097] (1950). Claims 10–12 of patent 3,459,680, . . . and claims . . . 17 and 24 of patent 3,436,357 are not infringed under this doctrine because there are fundamental differences between these claims in suit and the accused products and processes."

#12, Conclusions of Law in Infringement]

The findings of fact on non-infringement were not clearly wrong and the legal principles applied by the trial court were correct.

The portion of the judgment holding the patents non-infringed is affirmed.

## II.

*Mobil's patents could not be held valid and non-infringed*

█ The trial court not only found the patents not infringed (on which we affirm, *supra*) but also found the patents valid.

An adjudication on validity was reversed by the Supreme Court when there had also been a holding of non-infringement. Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S. Ct. 860, 83 L.Ed. 1263 (1939).

Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L.Ed. 1450 (1943), states: "To hold a patent valid if it is not infringed is to decide a hypothetical case." There, only one claim of a patent was involved in the issues raised by the complaint and answer, and the claim was held not infringed. However, a counterclaim raised the validity of other claims of the patent. The issues raised in the counterclaim as to the validity of the other claims of the patent were not moot, and the judgment was reversed.

Mobil cites Burgess & Associates, Inc. v. Klingensmith (9 Cir. 1973) 487 F.2d 321, which states: "Our holding that Klingensmith's devices do not infringe the 738 patent does not render moot the question of the patent's validity, since its validity is challenged in Klingensmith's counterclaim. Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450] (1943)."

The decision is correct.

In addition, the Ninth Circuit has spoken on the problem in various cases. Kemart Corp. v. Printing Arts Research Laboratories, Inc. (9 Cir. 1953) 201 F. 2d 624, 634, states:

"It has been said by the Supreme Court that it is the 'better practice' always to pass upon the question of validity. This language has been generally understood as a mere cautionary admonition to the courts to exercise their discretion whether to pass upon the question of validity, and to strike down clearly invalid patents where it would be in the public interest to do so, even though a finding of non-infringement would dispose of the case. A court may not, however, find a patent uninfringed and at the same time hold it valid, since a holding of

validity would be a decision of a hypothetical case." (Footnotes omitted)

Lockwood v. Langendorf United Bakeries, Inc. (9 Cir. 1963) 324 F.2d 82, 91, states:

"The law is not entirely clear as to whether, in such a case as this, the court is required to adjudge the validity or invalidity of the patent in suit. Undoubtedly, it had the power to adjudge it invalid. (Altvater v. Freeman, 1943, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450). It appears, however, that it would usually be error to adjudge it valid, in the face of a finding of non-infringement. (Electrical Fittings Corp. v. Thomas & Betts Co., 1939, 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263; Altvater v. Freeman, supra). To do so, says the Supreme Court, would be to decide a hypothetical case."

R. H. Baker & Co. v. Smith-Blair, Inc. (9 Cir. 1964) 331 F.2d 506, 507, states:

"... We ... agree with the district court that 'in no event should a judgment hold a patent valid, but not infringed.' See, e. g., Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); Electrical Fittings Corp. v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939); Lockwood v. Langendorf United Bakeries, Inc., 324 F.2d 82, 91–92 (9th Cir. 1963); Kemart Corp. v. Printing Arts Research Labs., Inc., 201 F.2d 624, 634 (9th Cir. 1953); Patent Scaffolding Co. v. Up-Right, Inc., 194 F.2d 457, 461 (9th Cir. 1952)." (Footnotes omitted)

M.O.S. Corporation v. John I. Haas Co. (9 Cir. 1967) 375 F.2d 614, 617, states:

"But if the issue [of validity] was litigated in the trial court, and if the record presented is such as to permit decision, the Court of Appeals can, and, at least where the answer seems clear, should decide the issue.[6]"

Footnote 6 reads in part:

"This, however, is subject to the rule that if the patent is not infringed, it should not also be held valid. The admonition is limited to those cases in which the patent is invalid. Kemart Corp. v. Printing Arts Research Labs, supra, n. 3; see Electrical Fittings Corp. v. Thomas & Betts Co., 1939, 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263."

In answer to the above authorities, Mobil cites Neff Instrument Corporation v. Cohu Electronics, Inc. (9 Cir. 1961) 298 F.2d 82; American Technical Machine Corp. v. Caparotta (2 Cir. 1964) 339 F.2d 557, cert. denied 382 U.S. 842, 86 S.Ct. 65, 15 L.Ed.2d 83 (1965); Marston v. J. C. Penney Co. (4 Cir. 1965) 353 F.2d 976, cert. denied, 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966); and Guiberson Corp. v. Equipment Engineers (5 Cir. 1958) 242 F.2d 431. In each case the court held the patent valid *and infringed*.

In *Neff*, this court stated in footnote 12 (298 F.2d p. 88):

"Because of what is hereinafter said [holding patents infringed], defendant's reliance on Kemart Corp. v. Printing Arts Research Laboratories, Inc., 9 Cir., 1953, 201 F.2d 624, 634, is of no moment. This renders the sixth error charged in the cross-appeal moot."

Our case concerns a holding below that the patent was valid and *not infringed*. The cases cited by Mobil do not negate or control our ruling in this case.

We hold the trial court erred in holding the patents valid, since it held the patents were not infringed. The judgment is reversed insofar as it holds valid claims 17 and 24 in Patent #'357, and claims 10, 11 and 12 in Patent #'680.

Although Mobil dismissed its appeal challenging the judgment on non-infringement as to claim 20, Patent #'267, and claim 1, Patent #'357, the judgment as to the validity of these

claims still stands and is before us on this appeal.

Since Mobil abandoned its appeal from the trial court's decision as to non-infringement of claim 20 of #'267, and claim 1 of #'357, we cannot rule on that issue. But this leaves the case in the posture of a trial court judgment of non-infringement of such claims and an appealable judgment that the claims were valid and enforceable. Accordingly, we also reverse the portion of the judgment holding claim 20 of #'267 and claim 1 of #'357 valid and enforceable.

### III.

*The Filtrol counterclaim was properly dismissed*

Following the trial the district court made extensive findings of fact and conclusions on Filtrol's counterclaim against Mobil for misuse of patents and for damages and dismissed the counterclaim.

In substance, it found that (1) Filtrol, far from being discriminated against by Mobil, refused even to consider a license from Mobil; (2) Mobil acted properly in its negotiations with W. R. Grace & Co., and in all of its licensing practices and policies; (3) the non-exclusive cross-license between Mobil and Esso Research and Engineering Corporation was entered into solely to resolve a "blocking patent" situation and was entirely lawful; and (4) Filtrol failed to prove it suffered the requisite damage to maintain an antitrust claim.

The issues in (1), (2) and (3) above were for the most part factual. In addition to the written exhibits there was considerable oral testimony from witnesses, particularly on Mobil's side of the case. The trial court had the opportunity to weigh the credibility of the witnesses. We cannot say the factual findings were clearly wrong nor do we find error in the legal principles applied by the district court. As to (4) above, we do not reach the problem in view of our holding on (1), (2) and (3) above.

The portion of the judgment holding the patents not infringed is affirmed.

The portion of the judgment holding the claims of the patents valid and enforceable is reversed. The portion of the judgment dismissing the counterclaim is affirmed.