**FILON PLASTICS CORPORATION,**
Plaintiff,

v.

**H. KOCH & SONS,** Defendant.

No. 38645.

United States District Court
N. D. California, S. D.

Jan. 29, 1965.

Thos. P. Mahoney, Los Angeles, Cal., for plaintiff.

George B. White, San Francisco, Cal., for defendant.

SWEIGERT, District Judge.

This is an action for patent infringement brought under 28 U.S.C. Sec. 1338 (a) and Sec. 1400(b) with a related cause of action for unfair competition under Sec. 1338(b). Defendant has counterclaimed for a declaration of invalidity.

Plaintiff, Filon, claims infringement of Shorts Reissue Patent No. 24,804 which was applied for February 21, 1958, and issued March 29, 1960 to plaintiff as assignee of the inventor Calhoun Shorts. This patent is a reissue of an original Shorts Patent, No. 2,784,763, applied for October 2, 1952 and issued March 12, 1957.

The Reissue Patent, '804, adopts its claims 1–25 from the original Shorts patent '763, and adds new claims 26–40.

In issue in this case are original claims 1, 2, 3, 7, 8, 12, 13, 16, 21, and 22, of which claims 1 and 22 (method claims) and claim 16 (an apparatus claim) are representative. Also in issue are reissue claims 26, 27, 28, 29, 31, 32, 33,

34, 35, and 36, of which claim 34 (an apparatus claim) is representative.

The patent is for an apparatus and method for making fiberglass-reinforced plastic sheet material, specifically to produce fiberglass reinforced plastic sheets of any desired cross-section, e. g., flat or corrugated, by a continuous process.

The apparatus, as shown in the photographs of plaintiff's own machine, P. Ex. 35, consists essentially of three sections joined together. The first section is the "sandwich" making section, the second is an oven in which the "sandwich" of cellophane, liquid resin, and fiberglass reinforcing material is shaped and then cured to full hardness, and the third section is the cut-off and trim apparatus.

In the apparatus, a continuous lower sheet or film of cellophane is fed into the machine. Liquid resin is fed onto this lower film, leveled to a predetermined depth and retained on the film by means of lengthwise bars which turn up the outer edges of the film. Into the resin is then laid the reinforcing fiberglass. The reinforcing material sinks into the resin and is also forced down into the pool of resin so that all air in the reinforcing material is displaced by the resin. The upper cellophane film is lowered onto the resin-impregnated fiberglass upon the lower film and the composite sheet is then rolled to consolidate the laminated structure to a predetermined thickness. The laminated structure is then drawn through a series of forming shoes while the sheet is heated to set the resin. Such shoes may be flat or of corrugated or other desired form. The set resin is then cooled, and the finished sheet material is edged and cut into panels of desired length.

The patent is a combination of some old elements with other claimed novel elements—among the latter being the direct deposit of resin upon a moving cellophane film, deposit of the reinforcing material on the moving resin, spaced shoes or dies in an oven to progressively form the sheet, and pre-shrinking of the cellophane film.

Defendant contends that neither its apparatus nor its method, as illustrated in the photographs of P. Ex. 37, infringes any of the claims asserted against it by plaintiff. Defendant has also raised the issue of invalidity which we will separately discuss.

### INFRINGEMENT

*Infringement—Claims 1, 2 and 22*

Claim 1 of '804 reads as follows:

"The method of making composite sheet material which comprises moving longitudinally a lower surface film, depositing heat settable liquid resin on such lower surface film, during continued longitudinal movement of such lower surface film carrying the resin, laying into such liquid resin stranded reinforcing material and thereby displacing the air in such reinforcing material with resin, covering the reinforcing material and resin with an upper surface film, consolidating the intermediate resin and reinforcing material by applying pressure to the lower surface film and thus forming a composite sheet, moving such composite sheet longitudinally through a heated zone and thereby setting the resin, and during such movement through at least the initial portion of such heated zone engaging opposite surfaces of the composite sheet and thereby shaping into a desired form the cross-sectional configuration of the sheet."

Plaintiff's expert read the words of this claim directly on defendant's accused machine. The expert's testimony, and the photographs of defendant's machine, appear to the Court to confirm that there is a literal infringement, or at least, infringement through the doctrine of equivalents.

■ "In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Tank

& Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

■ Defendant contends that his step of depositing or laying chopped fibers onto the liquid resin cannot be considered covered by the words "laying into such liquid resin stranded reinforcing material" because of certain representations made by the inventor, Shorts, in an interference proceeding in the Patent Office, No. 88818 (D. Ex. D). Shorts there claimed, on motion to dissolve certain of the counts in the interference proceeding, that his invention did *not* encompass a loose fiber mat being deposited on top of the liquid resin.

However, it is "well settled that in interference cases the doctrine of equivalents, applied in infringement cases, has no application." McBride v. Teeple, 109 F.2d 789, 799, 27 CCPA 961 (1940). Therefore, plaintiff is not estopped from claiming that the chopped fiber used by defendant does constitute "stranded reinforcing material" within the meaning of claim 1. The chopped fibers are cut from glass roving (continuous, stranded, glass fibers) and constitute "stranded reinforcing material" even though the strands are rather short.

Claim 2 differs from claim 1 only in that "glass mat" is used in the words of the claim rather than "stranded reinforcing material." In all other respects the claim is the same.

Plaintiff's expert testified that, in his opinion, the loose, chopped fibers deposited by the Koch apparatus constituted an unbonded mat (Rep. Tr. p. 768). We are also of the opinion that defendant's loose fibers form a kind of mat. This mat is not, perhaps, the kind of mat contemplated by the specifications since the mat cannot be mounted on a roll to be dispensed into the machine, but, nevertheless, a mat in the sense that it is incorporated into the plastic sandwich as reinforcing material.

Defendant also contends that his machine does not infringe claim 1 because the weighted "sandbags," used to press on the upper surface of the sheet as it moves through the oven, are not in "the initial portion of * * * heated zone * * *," that initial means the beginning, the front, and, therefore, since defendant's sandbags are located some thirty feet from the entrance to his oven they are not in the "initial portion."

The Court does not agree with this contention. Considered in context, the "initial portion of the heated zone" means that portion in which the curing of the resin has commenced and in which the sandwich of cellophane, resin, and glass fibers is still soft enough to form. The specifications (Col. 6, lines 35–42) indicate this by placing the first pair of "shoes" a "substantial distance from the entering end of the oven. * * * "

Claim 22 differs from claim 1 in that it claims "deforming the composite sheet from planar shape into a shape gathered transversely of its direction of movement by engaging opposite surfaces of the composite sheet and thereby shaping into a desired nonplanar form the cross-sectional configuration of the sheet." This claim is very broad in that no specific means of deforming the composite sheet is claimed. The claim can be read directly on the Koch method.

The Court therefore finds and concludes that claims 1, 2, and 22 of Re. '804 are infringed.

*Infringement—Claim 3*

Claim 3 is also a method claim. It reads as follows:

"The method of processing composite sheet material which comprises superimposing a cellophane lower surface film, an intermediate layer of liquid resin and reinforcing material and a cellophane upper surface film, shrinking the upper and lower surface films by heating them while such resin remains fluid, and while unset, and, during such film shrinking operation, smoothing the surface films and thereby eliminating therefrom wrinkles caused by such shrinking."

Plaintiff contends that the defendant infringes this claim by using heating means to shrink the cellophane films on his apparatus, and by using certain rollers to smooth the cellophane in accordance with the teachings of this claim.

The only evidence in the record of any use of heating of the cellophane films by the defendant is an admission by Maurice Koch of the experimental use of heat lamps or bulbs in an attempt to control the wrinkling of the cellophane films as they were fed into the machine from their respective rollers (Rep. Tr. pp. 1282–1295).

The Court need not consider whether this mere experimental heating means to shrink the cellophane films would be sufficient for a finding of infringement of this claim, (See Neff Instrument Corporation v. Cohu Electronics, Inc., 269 F.2d 668, 673 (9th Cir. 1959)) because we have reached the conclusion that claim 3 is not infringed in any event.

Considered in context, the claim is intended to cover only the shrinking of the cellophane of the composite sheet, i. e., the cellophane-resin-glass fibers sandwich *after* it has been assembled in the machine.

Plaintiff's expert also testified that certain rollers on defendant's machine performed smoothing operations (Rep. Tr. pp. 620–626). The record shows that defendant's smoothing operation, if it is that, takes place as the cellophane comes off its roll prior to the point of placing resin on the lower film, and prior to the placing of the upper film on top of the resin and glass fibers. As is the case with the shrinking operation, the words of the claim cover the smoothing operation only upon the composite sheet.

The Court, therefore, finds and concludes that claim 3 of '804 is not infringed.

*Infringement—Claims 7, 8, and 21*

Claims 7, 8, and 21 are similar and may be considered together. Claim 7 reads as follows:

"The method of processing composite sheet material which comprises laminating two surface films with an intermediate layer of heat settable liquid resin and reinforcing material between such surface films, consolidating such resin and reinforcing material by applying pressure to such surface films and thus forming a composite sheet, moving such composite sheet longitudinally through a heated zone and thereby setting the resin, during such movement through at least the initial portion of said heated zone engaging opposite surfaces of the composite sheet in a shape gathered transversely of its direction of movement and thereby shaping the cross-sectional configuration of the sheet into a desired form gathered transversely of its direction of movement, and between such consolidating and such engagement of the opposite sheet surfaces moving longitudinally such sheet unconfined and progressively gathering the composite sheet transversely of its direction of movement."

Claim 8 refers to the method of "making" composite sheet rather than of "processing." It also refers to "stranded" reinforcing material rather than "reinforcing material" and to "drawing such composite sheet between *dies* engaged with and smoothing opposite sides of such composite sheet in a shape gathered transversely of its direction of movement."

Claim 21 refers to "engaging opposite sides of each portion of such composite sheet intermittently, successively between *dies* arranged in succession in such heated zone, and thereby shaping into a desired form the cross-sectional configuration of the sheet."

These three claims represent that portion of the patent in suit which purports to disclose the invention of a method of forming the corrugations or other shapes of the final hard-plastic sheet.

The defendant's machine utilizes several lower forming members made of aluminum and shaped like the final corrugations desired in the hard sheet. In addition to these lower shoes, defendant's

machine utilizes a number of weighted "sandbags," disposed parallel to each other across the width of the oven and which press on the upper surface of the composite sheet some 30 feet inside the oven. (See P. Ex. 37p.)

The function of these sandbags is to press the still soft plastic sandwich into the corrugations in the lower forming member with which they are associated, thus giving final shape to the corrugated sheet prior to firm setting of the resin.

Defendant contends that, because he uses only *lower* forming members toward the entrance of the oven, and a combination of "sandbags" and a forming member further into the oven, he does not literally infringe claims 7, 8, and 21. Plaintiff on the other hand, contends that even one set of "shoes"—in this case the combination of upper and lower forming means—is sufficient to constitute the infringement.

The specifications describing the apparatus associated with these claims indicate that a number of sets of shoes is intended to be used in the forming of the corrugations. (See Col. 6, line 28 through Col. 7, line 28, Re. '804.) However, the words of the claims are not so limited. The sandbags and the corrugated shape do "engage opposite surfaces of the composite sheet" (claim 7), and do "shape the cross-sectional configuration of the sheet * * *" (claim 7). There is literal infringement here.

As already noted, claim 8 refers to "dies". Defendant contends that "dies" must be interpreted as two-piece affairs such as are used for molding plastics (die casting) or for stamping metal, i. e., having a male and a female element (Rep. Tr. p. 764–5). However, there are various kinds of dies, only some of which are made up of two pieces. The inventor, in the same specifications which describe a number of sets of shoes, uses the words shoe and die interchangeably. The defendant does use at least one forming station consisting of two elements—the sandbags and the corrugated aluminum bar. Thus, even under defendant's own interpretation of "dies" there exists at least the equivalent of the disputed element of claim 8.

Claim 21 differs somewhat in that, as quoted above, there is a distinct limitation to a method which uses more than one set of dies. The sheet is engaged "*intermittently, successively between* dies arranged in succession." This can only mean more than one set of dies as the specifications envision. Since defendant uses only one set of dies, as discussed above, the Court finds no infringement of this claim.

The Court therefore, finds and concludes that defendant infringes claims 7 and 8 of Re. '804, but does not infringe claim 21.

*Infringement—Claims 12 and 13*

Claims 12 and 13 are apparatus claims reading as follows:

12. "Apparatus for making composite sheet material including cellophane surface films and an intermediate layer of resin and stranded reinforcing material between such films, comprising means operable to move such surface films longitudinally with heat settable liquid resin there between, heating means disposed along the path of such movement and operable to heat such surface films initially and thereby shrink such films prior to setting of the resin from fluid condition, and additional heating means disposed along such path of movement beyond said first heating means and operable to heat the resin and thereby set it after the surface films have been shrunk.

13. The apparatus defined in claim 12, and sheet-smoothing means engageable with a surface film, interposed between the heating means and operable, prior to heating of the sheet for setting the resin, to smooth from the surface film engaged thereby wrinkles caused by shrinking of such film."

These are apparatus claims covering the method of claim 3 already discussed. These claims, even more specifically than

642

claim 3, show that the cellophane shrinking operation was intended to be accomplished only *after* the cellophane, glass fibers, and liquid resin had already been brought together within the machine.

For reasons set forth in the discussion of claim 3, the Court finds and concludes that claims 12 and 13 are not infringed by defendant's apparatus.

*Infringement—Claim 16*

Claim 16 is an apparatus claim. It reads as follows:

"Apparatus for making composite sheet material including surface films and an intermediate layer of resin and stranded reinforcing material between such films, comprising an oven, and sheet-engaging shoes received in said oven and spaced apart lengthwise of it and engageable respectively with portions of the surface films alternating unconfined portions of such films for smoothing opposite sides of the composit sheet as it is drawn between said shoes during its passage through said oven."

This apparatus claim is associated with method claims 7, 8, and 21 already discussed. Plaintiff's expert testified to infringement of this claim, because, he said, that when defendant's composite sheet passes *over* the successive *lower* corrugated-shape supports in defendant's apparatus, the sheet passes "between said shoes" as in the words of the claim (Rep.Tr. pp. 581–584). He thus interpreted "between" to mean between (lengthwise) *successive* lower supports *rather* than between or inside a pair of corresponding *upper* and *lower* supports.

It is true that the composite sheet does pass "between" the sandbags and a lower forming member of the Koch machine in the latter sense. However, the basic question of infringement is not whether the sheet passes *between* shoes of the defendant's machine, but rather whether the use by the defendant of only one set of shoes accomplishes the same result envisaged by the use of more than one set as set out in the claim.

The defendant uses only one set of "shoes" to shape and smooth the composite sheet prior to the final hardening of the sheet in the oven. The use of more than one set of shoes is not essential to the claim as is the use required in claim 21.

■ "Infringement is not avoided by making into one part that which has been shown as two where there is no change in the function or manner of operation of the element." Zysset v. Popeil Brothers, Inc., 276 F.2d 354, 357 (7th Cir. 1960). The defendant eliminates all but one set of shoes in his apparatus; he does not, strictly speaking, combine them. Defendant's one set of shoes accomplishes exactly the same results as the invention's several sets.

The Court therefore, finds and concludes that defendant infringes claim 16 of Re. '804.

*Infringement—Claims 27, 33, and 36*

Claims 27 and 33 are method claims added in the reissue. Claim 36 is their associated apparatus claim. Part of the claimed invention of claim 27 is in the following words, "deflecting opposed marginal edges of said film upwardly to give the film a trough-like configuration. * * *" The words of claim 33 are "forming a channel in the moving flexible film. * * *" The associated apparatus of claim 36 is "guide rails beneath each side edge portion of the flexible film. * * *" Such guide rails may be seen in plaintiff's machine. (P. Ex. 35–b.)

The claimed infringement of defendant appears in P. Ex. 37–c. Defendant utilizes two arms or gates, one near each edge of the lower cellophane film. These arms serve to confine the pool of resin well within the edges of the film, and, also, serve to maintain a constant amount of resin upon the film. (Rep. Tr. pp. 1295–1302.) Plaintiff contends that defendant practices the equivalent of turning up the edges of the film by, in effect, turning the idea upside down. This is done, according to the plaintiff, by raising an artificial edge on the film

by means of the arms or gates. (Rep. Tr. pp. 766–769.)

The guide rails of claim 33 are designed to form a trough within which the liquid resin is retained on the lower film. Defendant's arms or gates do not retain the liquid resin on the film after the resin passes under the knife edge (called "doctor blade" by plaintiff). In plaintiff's design the resin cannot flow beyond the upturned edge of the film unless excess resin is placed upon the lower film. Defendant's device, on the other hand, does not prevent resin from flowing toward the edge of the film; there is no physical barrier whatsoever beyond the knife edge.

■■ "The test of identity or equivalence of two processes is not the apparatus or materials used but whether they involve identical or equivalent steps. Steps are equivalent if they work in substantially the same way to accomplish the same results." Kemart Corporation v. Printing Arts Research Laboratories, Inc., 201 F.2d 624, 629 (9th Cir. 1953).

■ The test of equivalence in apparatus is similar to that for processes: "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." Graver Tank & Mfg. Co. v. Linde Air Products Co., supra.

Application of this rule to this situation leads to the conclusion that the defendant does not practice the equivalent of the process steps of claims 27 and 33. While he does accomplish the same result, that of confining the liquid resin within the edges of the film, he does so in a substantially different way.

The Court therefore, finds and concludes that there is no infringement of claims 27, 33, and 36.

*Infringement—Claims 28 and 29*

Claims 28 and 29 are different from all the other claims thus far considered in that they nowhere specify continuous movement of the films and the composite sheet. Since defendant's process is a continuous one there cannot be any infringement of these claims by him. The Court, therefore, so finds and concludes.

*Infringement—Claims 26, 31, 32, 34, and 35*

Claims 26, 31, and 32 are method claims, claims 34 and 35 are apparatus claims. Defendant contends that certain words in these claims are not to be found in either the method he practices or in his apparatus. These words are "partially curing" or "partially cured."

Defendant contends that he has no such step in his process, that he has no such means in his machine. The discussion above with respect to infringement of claims 1, 2, and 22 and the "initial portion of the heated zone" is applicable here. The above reissue claims are mere rephrasing of the language already discussed. Partial curing takes place in the initial portion of the oven as the liquid resin is heated. Subsequent to this initial heating the composite sheet is shaped, both in the patent claims and in defendant's method and apparatus.

The Court therefore, finds and concludes that defendant infringes claims 26, 31, 32, 34, and 35.

## VALIDITY

*Validity—Introduction*

Plaintiff contends that the Shorts invention achieved surprising and new results, i. e., (1) substantial reduction of labor costs in manufacturing panel; (2) elimination of waste incident to the batch method; (3) elimination of numerous and costly dies inherent in the batch method; (4) accurate control of raw material, including the liquid resin, resulting in both savings in the raw material and a more satisfactory and accurate panel; (5) high speed production of panel not obtainable by the batch process; (6) flexibility of operation whereby the changing of a relatively few dies in the oven results in a change of shape

of the panel; (7) a flexible method and apparatus which may be utilized with a wide variety of different materials; (8) uniformity of panel produced; (9) unlimited variety of shapes and weights, (P. Brief, p. 4–5).

However, any prior art "continuous" method of making reinforced plastic sheets would produce such results. Such results are not new or surprising; they are the normal, expected advantage of any mechanical, automatic process over manual operations.

As we shall hereinafter note, Shorts was not the inventor of an apparatus or method for the mechanical, automatic, continuous production of reinforced plastic sheets—as distinguished from the manual, or "batch" method. Mechanical, automatic, continuous apparatus and methods were already a part of the prior art.

Every combination of old prior art elements, which contributes in some degree to such results as cost reduction, waste elimination, efficiency, speed and control, is not necessarily so new and surprising as to amount to novelty or invention over the prior art. The results of a mere combination must be in fact so new, surprising and substantial that, when considered in the light of the prior art, the result transcends the obvious and rises to the dignity of invention.

The questions are, therefore, whether the Shorts combination was *anticipated* by the prior art and whether, in any event, the Shorts combination constitutes *invention* in the light of prior art.

### Validity—Prior Art—Anticipation

■ The defendant has cited a number of patents which, he contends, anticipate the various claims of the Shorts patent. The test of anticipation, as stated in Walker on Patents, Deller's Ed., p. 255, is that "in order to negative novelty or, as it is usually expressed, to 'anticipate' an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single

description or structure where they do substantially the same work in substantially the same way." See also, Stauffer v. Slenderella Systems of California, Inc., 254 F.2d 127 (9th Cir. 1957).

■ The Court has examined all of the patents cited as constituting prior art, as well as the article from "Modern Plastics Encyclopedia and Engineer's Handbook (Def. Ex. I–1 and its enlargement, Ex. R). It is true, as defendant contends, that all (except perhaps the cellophane shrinking steps) of the various elements of the claims of the Shorts invention are to be found in the prior art. But, all of the elements of any one claim are not found together in any one prior patent. The Court, therefore, finds and concludes that there is no anticipation of the Shorts patent in the prior art.

### Validity—Date of Invention

We should first dispose of plaintiff's contention that in determining the validity of the patent at issue, certain patents issued after January, 1950, cannot be considered as prior art.

Plaintiff asserts that, although his patent application was not filed until October 2, 1952, the evidence shows earlier invention and reduction to practice as of January, 1950.

In support of this contention plaintiff cites United Shoe Machinery Corporation v. Brooklyn Wood Heel Corporation, 77 F.2d 263 (2d Cir. 1935).

The standard set out in United Shoe has often been cited by other Courts of Appeals and is to the effect that "[w]hen an inventor's date is to be carried back beyond his application, courts regard the effort with great jealousy, and must be persuaded with a certainty which is seldom demanded elsewhere; quite as absolute as in a criminal case, in practice perhaps even more so. [citing cases] It makes no difference how the question arises; whether the patentee is carrying back his own invention, or a supposed infringer is carrying back his; the bur-

den is the same as the proof necessary to establish a prior use." Id. at 264. In interference proceedings the Court of Customs and Patent Appeals requires independent corroboration of the inventor's testimony. Self-serving documents, no matter how trustworthy the inventor who produced them, are insufficient. Alpert v. Slatin, 305 F.2d 891, 896, 49 CCPA 1343 (1962); Crane v. Carlson, 125 F.2d 709, 713, 29 CCPA 879 (1942).

Is the evidence presented by the plaintiff in the present case sufficient to establish a date of invention earlier than the filing date of October 2, 1952?

The inventor has testified that the approximate date of his conception was 1947. (Tr. p. 127). In 1948 he built a wooden prototype and completed experiments with it as to the consolidation or "sandwich making" phase. (Tr. p. 133). In March, April, and June of 1949 he had a draftsman prepare drawings of a second experimental machine. (P. Exs. 3–31A). These drawings were identified by the inventor as having been prepared by one Roessl (Tr. p. 134) but Roessl did not independently testify.

Further, it appears that among these drawings, a parts list (P. Ex. 3) although signed by Roessl, is undated. Detail drawings of a pulley assembly (P. Ex. 4) are dated but unsigned. The parts details (P. Exs. 5–20) are also dated but unsigned. A pully assembly (P. Ex. 21) is dated and unsigned, and an unsigned, undated cost estimate from a supplier, Link-Belt Company, is attached to it. A drawing of a dispenser assembly (P. Ex. 22) is neither dated nor signed.

The large drawings of the machine frames are in the same class: Oven Bed (P. Ex. 23), Flat Platen (P. Ex. 24), Frame & Bed Assembly (P. Ex. 25) Corrugation Platen (P. Ex. 26), Frane [sic] Assembly (P. Ex. 27), and Belt Casting Machine, Front End (P. Ex. 28) are all dated but unsigned. A drawing of a Drive-Laminating Machine (P. Ex. 29) is dated "9/15/49" and a drawing of a Drive-Frame, Weld Assembly (P. Ex. 30) is dated "9/16/49". Both these drawings are signed by C. N. Roessl. The title box of the drawing which is P. Ex. 31 has no writing in it at all.

An assembly drawing of the entire machine (P. Ex. 31–A) is in very poor physical condition. None of its parts is labeled or identified; a large piece of the drawing, the lower right-hand corner is missing, so that there is no title box to identify the drawing, its date, or who drew it. Further, one of the basic parts of the claimed invention, the dispenser for depositing the resin on the lower sheet of cellophane is not even shown on the drawing.

We do not consider that the evidence above summarized meets the test of United Shoe, supra, as to corroboration.

The evidence concerning the alleged sale to Acme Glass Co. (Tr. p. 159·) in May, 1952 of material manufactured on the inventor's third machine is in the same general category, self-serving and uncorroborated.

However, even assuming that the drawings were sufficiently corroborated in accordance with these requirements, the Court is of the opinion that the drawings fail to meet another, different test, i. e., that "the drawings exhibited and relied on as evidence of the conception of the invention must show a complete conception, free from ambiguity or doubt, and such as would enable the inventor or others skilled in the art to reduce the conception to practice without any further exercise of inventive skill." Armstrong v. De Forest Radio Telephone & Telegraph Co., 280 F. 584, 590 (2d Cir. 1922).

This Court cannot find, from an inspection of all the drawings noted above, that one skilled in the art could "reduce the conception to practice without any further exercise of inventive skill."

The Court therefore, finds that the inventor Shorts must be limited to his filing date of October 2, 1952.

In being thus limited, can Shorts be considered the first inventor of the method and apparatus of his patent?

There is evidence in this case which shows that another had made a complete and accurate description of the claimed invention as early as July 23, 1951.

Part of this proof is in the deposition of one Joseph S. Finger, D. Ex. M–1, M–2, and M–3. These exhibits consist of two sketches and a "patent disclosure" made for the purpose of outlining the invention by Finger to his attorney. Finger's invention, as disclosed in the sketches, clearly anticipates most of the claims of the Shorts patent. All three exhibits clearly show the receipt stamp of a firm of Houston, Texas attorneys dated the same day as the signed sketches, July 23, 1951.

In the case of Alexander Milburn Company v. Davis-Bournonville Company, 270 U.S. 390, 400, 46 S.Ct. 324, 70 L.Ed. 651 (1926) it was held that "one is not the first inventor if, as was the case here, somebody else has made a complete and adequate description of the thing claimed before the earliest moment to which the alleged inventor can carry his invention back." Therefore, the evidence discloses that Shorts was not the first inventor of the method and apparatus shown in his original patent '763 except for the claims involving the cellophane shrinking steps.

This Court can only speculate upon the reasons for the decision of the assignees of Finger's patent application to concede priority to Shorts in the interference proceedings in the Patent Office. (See D. Exs. C, D, and E and P. Ex. 34.) It may well be that Shorts could have presented sufficient independent corroboration in those proceedings and the plaintiff might have done the same in this case. But the Court must be limited to the evidence before it, making its decision accordingly.

If we go further and assume that Shorts had presented sufficient independent evidence which would permit the Court to carry the date of his invention back to January, 1950, he would still not be entitled to claim first invention.

Defendant has introduced into evidence certain patents, and relied upon them to show that others than Shorts had in fact, invented methods and apparatus suggestive of the Shorts claimed invention long before 1950.

The following patents, among others, were introduced by defendant and relied upon by him as evidence to negative invention: Green, Patent No. 2,496,911, filed June 7, 1945, issued February 7, 1950; Williams, Patent No. 2,500,728, filed June 11, 1945, issued March 14, 1950; Gray, Patent No. 2,526,945, filed December 7, 1945, issued October 24, 1950; Muskat, Patent No. 2,596,162, filed March 1, 1945, issued May 13, 1952; and Morrison, Patent No. 2,662,044, filed July 28, 1949, issued December 8, 1953.

The doctrine of the Milburn case, supra, is that "the effective date of a United States Patent [is] the date of filing of the application thereof. * * It follows that such of the foregoing rules as involve an inquiry into the state of the art to which the thing or process in controversy pertains, may involve an inquiry into the date and the character of inventions which were in fact unknown to the patentee, when he produced that thing or process. Where those prior inventions are proved by prior patents, those patents are the record evidence of those parts of the prior art which they present. The rights under the later patent are subject to what this record evidence actually shows." Walker on Patents, Deller's Ed., pp. 137–138.

It follows, therefore, that all of the patents to be discussed below under the heading of Lack of Invention, having been *filed* prior to January, 1950, may be considered as prior art on the issue of invention.

*Validity—Lack of Invention*

The most significant prior art cited by the defendant is the following: the Green Patent; the Modern Plastics article, published in May, 1950; the Williams Patent; the Gray Patent; the Muskat

Patent; and the Morrison Patent. None of these prior art patents, nor the Modern Plastics article, were cited in the file wrapper of the original Shorts patent (No. 2,784,763). Only Gray and Morrison were cited in the file wrapper of the reissue patent.

We proceed, therefore, to consider the above-mentioned prior art.

The Green patent relates to the continuous production of plastic laminates by impregnating bibulous sheet material with liquid plastic, enclosing the impregnated material in cellophane, progressively heating the "sandwich," and finally stripping the cellophane from the cured sheets for trimming, cutting, etc. The patent contemplates the dip-tank method of impreganting the bibulous material. The material is not limited to any particular kind. The specifications, Col. 13, lines 43–44, mention glass, specifically glass fabric. There is no mention in this patent of any shaping means.

The Modern Plastics Article description is very much like that of the apparatus of the Green patent. As in Green, no shaping of the flat sheets is contemplated by the apparatus described, but on p. 934 of the article, under "Post-forming" it is stated that "Under development also are procedures whereby corrugations, angles, curvatures, etc., may be incorporated during manufacture." Glass fabric is one of the reinforcing materials specifically enumerated.

The Williams Patent is based on a Great Britain patent of December 17, 1943. The patent discloses a method of manufacturing, on a continuous basis, sheets of polymeric resin. The method involves the use of either liquid or paste resin applied to the lower of two continuously moving belts or bands. The specifications contemplate that both of the moving surfaces may be composed of cellophane (Col. 3, lines 11–19), and claim 4 claims this as part of the invention. Shaping of the plastic sheets is noted as a potential variation (Col. 4, lines 10–21). Reinforcement by use of textiles or other fabrics fed between the moving surfaces is also noted (Col. 2, line 46;

Col. 4, lines 27–32). There is a spreader blade, 8, designed "to ensure a steady supply of polymerisable material [resin] to the nip beneath the [upper] drum 3."

The Gray Patent discloses a method of and apparatus for forming shapes of resin impregnated fabric. The process is continuous, utilizing the dip-tank method of impregnation of the fabric. The specifications and claim 1 of the patent disclose "passing the impregnated flat web through a forming mold for gradually and progressively changing the shape of said web into the desired cross sectional shape while the resin is in fluid condition." The impregnated fabric may be, as an alternative in this patent, enclosed in cellophane.

The Muskat Patent is similar in many respects to the patents already noted. It too envisions dip-tank impregnation of fibrous sheet material, enclosing the impregnated material in cellophane, then partially curing or fully curing the composite sheet. The patent specifications do not contemplate continuous shaping of the partially cured sheet, rather the process is a discontinuous one. The specifications describe (Col. 7, lines 3–31) cutting of the partially cured sheets into lengths which may thereupon be shaped as required in an entirely separate operation.

The Morrison Patent involves a method of producing what its inventor calls coated fabrics, described in detail in Col. 7, lines 3–41 of the specifications. A plastisol is sprayed between two sheets of cellophane which are brought together in order to uniformly coat both surfaces. Upon separation of the sheets glass fibers are rained down upon the lower sheet, the two sheets are brought together again with the glass fibers and plastic sandwiched between and the sandwich is then cured under heat and pressure to obtain the final product. This particular invention contemplates the use of flexible plastic in order to obtain a reinforced fabric rather than rigid sheets but the specifications note that harder resins or resins of the thermosetting type may be used "without departing from the spirit of the invention." (Col. 8, lines 58–66.)

The test of patentability under 35 U.S.C. Sec. 103 has been stated by the Court of Appeals of this Circuit in Griffith Rubber Mills v. Hoffar, 313 F.2d 1, 3 (9th Cir. 1963):

"Patents are issued not for private benefit but for the public good; they grant a monopoly for a limited period as an incentive to the disclosure of innovations which in the end will add to the fund of freely available knowledge. However, the public is entitled to benefit, without granting special concessions, from such advances as normally flow from the application of the ordinary skills of one in the trade to the existing fund of public knowledge. Thus the statute prescribes, as a condition of patentability, that what has been accomplished must be such that it would not have been obvious to a hypothetical person skilled in all that could have been known, at the pertinent time, in the field to which the invention relates.

"It follows that though a device may be new and useful it is not patentable if it consists of no more than a combination of ideas which are drawn from the existing fund of public knowledge, and which produces results that would be expected by one skilled in the art."

The ultimate question for this Court is, therefore, whether in the light of these prior art references the Shorts patent can be considered as more than a mere aggregation of elements old in the art and producing no new or surprising results.

 There is a presumption of validity arising from the grant of the patent by the Patent Office. But this presumption may be dispelled, especially by reference to pertinent prior art which was not before the Patent Office when the patent was granted. Pressteel Company v. Halo Lighting Products, Inc., 314 F.2d 695 (9th Cir. 1963).

Considered in the light of these rules, the evidence does not show any new or surprising consequences of the aggregation of the old elements combined in the Shorts patent.

The Green patent shows a continuous method of producing plastic sheets—as does the Modern Plastics article. Were it not for the fact that these two prior art devices and methods utilize dip-tanks, rather than a pouring of the liquid resin onto a moving film, as in Shorts, the Shorts patent would be anticipated in virtually all its claims.

The Williams patent also shows a continuous method of producing plastic sheets and, further, contemplates the depositing of a pool of liquid resin on a moving lower surface film of cellophane. The question of novelty, or *anticipation* of the claims of the Shorts patent by the disclosures of Williams was a close one which the Court has resolved in favor of the Shorts patent because the Court did not feel that the disclosures in the specifications of Williams concerning the sandwiching of the reinforcing material and resin within the sheets of cellophane were clear enough for a finding of anticipation.

However, on the question of invention, the test is different. The Shorts patent shows no new or surprising advance over the elements of Williams patent when those elements are taken together with the teachings of Green and the Modern Plastics article. Two or more references may be combined for the purpose of showing obviousness. Griffith Rubber Mills v. Hoffar, supra.

The other prior art patents discussed above are merely cumulative. They also show that the Shorts invention did not rise to the level of invention required by the statute.

Additional patents have been cited to the Court, particularly with respect to the claims of the Shorts patent involving formation of a channel in the lower surface film. These are Utzman, Patent No. 1,029,328, June 11, 1912, and Birdsey, Patent No. 1,383,255, June 28, 1921. Plaintiff contends that this additional prior art is non-analogous and too remote. Whether prior art it analogous depends upon the similarity and purposes of the

arts involved in the sense that, if the elements and purposes in one art are so related and similar to those in another art that the relationship would appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then the arts may be said to be analogous. Stearns v. Tinker & Rasor, 220 F.2d, 49, 56 (9th Cir. 1955).

These additional patents involve the manufacture of plaster boards. Both show means for turning up the outer edges of the lower sheet of paper in order to retain the still plastic plaster within the sheet. Birdsey in particular shows the formation of a trough in the lower sheet.

The Court is of the opinion that these patents do constitute analogous art. It must be borne in mind that the entire field of reinforced plastics, such as involved in this case, is quite new, having been initiated, for commercial purposes, only in the late 1940's. It would, therefore, be natural for one seeking to make sheets of reinforced plastic to look to other industries in which similar sheets are made by a continuous process. The wallboard or plaster board industry is one to which a person having mechanical skill would look for relationships to the problem at hand.

The Court, therefore, finds and concludes that patents in the plaster board field are in an analogous art, and that the method of turning up the edges of the lower surface film is old in that art. Turning up the edges of the lower cellophane film to retain a viscous plastic on the film is not a patentable advance over this analogous prior art.

The Court therefore, finds and concludes that the following claims of the Shorts Reissue patent '804 are invalid for lack of invention: Claims 1, 2, 7, 8, 14, 15, 16, 21, 22, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 39, and 40.

## UNFAIR COMPETITION

The plaintiff presented little real evidence of unfair competition by the defendant relying, apparently, upon the inferences to be drawn from the lack of growth of plaintiff's business in the Bay area (Rep.Tr. pp. 478–481 and P.Exs. 53 and 54). Plaintiff's sales manager for this area testified that he was told that certain customers had stopped buying from plaintiff's distributor because of lower prices charged by defendant (Rep. Tr. pp. 1349–1350). But this same witness was unable to cite any instance of palming off by defendant, or confusion in the trade, stating: "I would say if he bought it from Koch, he would know it came from Koch." (Rep.Tr. p. 1363.)

Since the acts of defendant which are asserted to constitute unfair competition occurred in California, California law on that subject governs. Under the law of California the test of unfair competition is whether there is likely to be deception of the public, whether there has been a palming off of defendant's goods as those of plaintiff. Calif. Civ.Code Sec. 3369; Calif.Bus. & Prof. Code Secs. 17500–17535; 4 Witkin, Summary of California Law, Equity, Secs. 56–60, and cases there cited.

Under the California law applicable there has been no unfair competition shown by the plaintiff, and the Court so finds and concludes.

In view of the Court's conclusions with respect to the validity of the patent in suit, the Court finds it unnecessary to pass on the other issues urged by the defendant, viz., the inadequacy of the second Shorts Reissue Oath; intervening rights of defendant as to broadened claims added by the Reissue; and invalidity of certain Reissue claims because of the introduction of new matter.

The defendant will within ten (10) days prepare proposed findings of fact and conclusions of law and a judgment in accordance with the foregoing Memorandum of Decision, serve the same, with a copy, upon all other parties for approval or disapproval as to form, and lodge the original, bearing proof of service and such approval or disapproval as to form, with the Clerk of the Court.